[No. 32736.  Department Two.  April 9, 1954.]

LLOYD L. MADISON, *Respondent*, v. ANDREW H. LASENE, *Defendant*, RAY LASENE, *Appellant*.[1]

[1]Reported in 268 P. (2d) 1006.

*Atwell & Bergman (James O. Ballou,* on the brief), for appellant.

*Ronald Moore* and *Jerome Walstead,* for respondent.

HILL, J.—This is an action by Lloyd L. Madison to enjoin Andrew H. LaSene and his son Ray LaSene from engaging in the upholstery business and from using the name LaSene in connection therewith. The findings of fact made by the trial court, which are accepted as the facts of the case, may be summarized as follows:

For twenty-eight years prior to April 7, 1952, Andrew H. LaSene engaged in the upholstery business in Kelso, Washington, under the name "LaSene's Custom Upholstery." During the last fourteen years he conducted that business at 1012 north Second avenue.

He entered into a written agreement with Lloyd L. Madison April 7, 1952, whereby the latter purchased the business, including the good will. It was agreed that Madison

was to have the exclusive right to use the name "LaSene's Custom Upholstery," and that Andrew LaSene would not engage in the upholstery business for a period of five years within a radius of five miles of 1012 north Second avenue. The agreement further provided that Andrew LaSene would lease the premises at 1012 north Second avenue to Madison on a month-to-month basis.

Madison conducted his upholstery business at 1012 north Second avenue under the name of "LaSene & Madison Custom Upholstery" until March 9, 1953, when he moved it to 1502 north Pacific highway, Kelso. Because of the termination of the lease and this move, Andrew LaSene became enraged and threatened to "break" Madison.

About the middle of March, 1953, Ray LaSene, son of Andrew LaSene, left Castle Rock, Washington, where he had been employed in the logging industry, and thereafter lived at the home of his father in Longview, a city contiguous to Kelso. Prior to the sale to Madison, Ray had worked in the upholstery business of his father off and on for about a year and a half. (The court also found that it normally requires five years' experience for a person to become a qualified upholsterer.)

On or about April 1, 1953, Ray and his father erected a sign on the roof of the premises at 1012 north Second avenue, Kelso, reading, " 'Ray [in small letters] LaSene's Upholstery [in much larger letters].' " A similar sign, but with all the letters of equal size, was affixed to the awning on the front of the premises. On or about the same date, Ray and his father erected signs on the front lawn of the latter's home in Longview, reading, " 'R. A. LaSene's Upholstery, 1012 N. 2nd, Kelso, Washington, phone 5820 or inquire here.' " On April 2, 3, and 4, 1953, Andrew LaSene placed an advertisement in the Longview Daily News reading, " 'Now open Ray LaSene's Upholstery Shop 1012 N. 2nd, Kelso, phone 5820.' "

From and after April 2, 1953, Andrew LaSene was engaged in the upholstery business at 1012 north Second avenue, Kelso, Washington, solicited accounts for said business,

prepared estimates, and worked in the shop two or three hours each day. He also furnished the truck used to transport furniture in connection with the business. He placed all the newspaper advertisements and made arrangements for credit for the business, and paid by his personal check all expenses incurred in the business. He owned the premises at 1012 north Second avenue, and charged Ray no rent for their use. He owned all the equipment and tools located on the premises.

Ray knew of the written agreement between his father and Madison, and he had no real interest in the business. He started to work in the upholstery shop on or about April 7, 1953.

As a result of their opening of the business at 1012 north Second avenue and using the name LaSene in connection therewith, there was considerable public confusion concerning the ownership and identity of the two upholstery businesses. The customers of each mistook one for the other, in that customers intending to call at Madison's place of business mistakenly called at 1012 north Second avenue, and vice versa. Mail and shipments of goods and materials were, by reason of such confusion, delivered to the wrong place of business. By reason of Andrew LaSene's wrongfully engaging in the upholstery business in derogation of his agreement with Madison, respondent Madison lost considerable business and the good will of his business was damaged.

The upholstery business, as conducted by the parties, is carried on by personal solicitation and the display of samples to prospective customers. The upholsterer takes his samples to the home of the customer and makes an estimate of the price at which he will do the work and, if his offer is accepted, sends a truck to pick up the furniture and return the finished work to the customer. The upholsterer has but few regular customers, those usually being furniture dealers.

From these findings of fact, the trial court concluded (and we think justifiably so) that Andrew H. LaSene was the real owner of the upholstery business which was being conducted

at 1012 north Second avenue under the name of "Ray LaSene's Upholstery"; that Ray LaSene conspired with his father to break the restrictive covenant the latter had made with Madison; that Ray LaSene aided and abetted his father in engaging in the upholstery business in violation of the terms of that covenant; and

". . . that the purported ownership thereof by . . . Ray LaSene, is a sham and a fraud, and that this deceit is carried on for the purpose of concealing the identity of . . . Andrew LaSene, as the true owner of the said business."

Based upon these findings and conclusions, the trial court enjoined Andrew H. LaSene and Ray LaSene, and all persons acting under their control, authority, or direction, from

". . . doing, transacting, soliciting, carrying on, or engaging in any upholstery business wherein any furniture is upholstered, repaired, handled or deal in articles commonly dealt in or worked in or upon by upholsterers within a radius of five miles of 1012 N. 2nd Ave., Kelso, Washington, for five years commencing on April 7, 1952;"

from engaging in such business "under any name or style wherein the words 'LaSene's Upholstery' are used, or the name 'LaSene' appears in any manner whatsoever" within that area and for that period of time; and from

". . . operating, engaging in or carrying on for a period of five years from April 7, 1952, that certain upholstery business now located at 1012 N. 2nd Ave., Kelso, Washington, and being operated under the name and style of 'Ray LaSene's Upholstery.'"

Andrew H. LaSene did not appeal, but his son Ray LaSene appeals, emphasizing that he was not a party to the contract between Lloyd L. Madison and his father, and that the restrictive covenant of their agreement does not apply to him or his activities.

Appellant's principal objections to the injunction are that it limits him in: (a) the use of his own name (*i.e.*, Ray LaSene) in connection with any upholstery business within the area and time referred to; (b) the use of the premises at 1012 north Second avenue, Kelso, for carrying on any

upholstery business; and (c) engaging in the upholstery business under any name within five miles of 1012 north Second avenue, Kelso, for a period of five years from April 7, 1952. (We would ask the reader to bear in mind these limitations of time and space under which the injunction was to be effective, as we shall not always repeat them.)

We shall first consider "(c)" since, if appellant, Ray LaSene, is properly enjoined from engaging in the upholstery business under any name and in any part of the area referred to, it becomes unnecessary to discuss either "(a)" or "(b)."

▉ We are of the opinion that the injunction is too broad, and that appellant cannot be absolutely enjoined from carrying on the upholstery business within the area referred to. He was not a party to the restrictive covenant and cannot be bound by its terms except in so far as his activities constitute a conspiracy for its breach, which is, in effect, a conspiracy for unfair competition. The trial court doubtless felt, and probably justifiably so, that the only practical means of preventing a continuance of the conspiracy was to prohibit both the father and son from engaging in the upholstery business within the area and for the time indicated. However, it seems clear to us that appellant cannot be denied the right to make a legitimate effort to carry on an upholstery business, subject, however, to the limitation that it cannot be in association with Andrew H. LaSene, or with his assistance, directly or indirectly.

▉ There is, however, one specific location within the area indicated where we believe the all-inclusive prohibition should be upheld, and that relates to any use of the premises at 1012 north Second avenue, Kelso, which is pinpointed by "(b)," *supra*. For fourteen years prior to the sale of his upholstery business to the respondent, Andrew H. LaSene had carried on the business at that location. The public associated the upholstery business at that address with his name. Respondent had lawfully acquired that business and the right to the use of the business name. The premises are still owned by Andrew H. LaSene, and he

and the appellant used them from early April, 1953, until enjoined (October 2, 1953), that use having been found to be in furtherance of a conspiracy to violate the restrictive covenant. Any continuance of an upholstery business at that address by appellant would be but a perpetuation of the result of the tortious conspiracy in which he and his father had engaged, rendering the injunction against Andrew H. LaSene a mere "futile gesture."

We have two cases directly in point, *Merager v. Turnbull*, 2 Wn. (2d) 711, 99 P. (2d) 434, 127 A. L. R. 1142 (1940), and *Lyle v. Haskins*, 24 Wn. (2d) 883, 168 P. (2d) 797 (1946). In the first of these two cases, Alex Turnbull had sold to Merager an undertaking business, including the good will and the right to use the name "Turnbull Funeral Home," and had agreed to refrain from engaging in the undertaking business in the city of Spokane. Thereafter, Alex Turnbull erected a modern mortuary in the block where the undertaking business which he had sold was being conducted, with the expectation that the mortuary would be leased to his son Bruce. The trial court found that the father and son had entered into a conspiracy to compete unlawfully with Merager and to destroy his business, and enjoined each of them from *carrying on an undertaking business in the new building under any name*. It was argued on behalf of Bruce Turnbull, as it is argued on behalf of Ray LaSene, that he was not a party to the restrictive covenant. In affirming the trial court, we said:

"To permit Bruce Turnbull to conduct the undertaking business practically next door to the undertaking business of respondent, would render valueless the rights of respondent under his contract with Alex Turnbull, and the injunction against Alex Turnbull would be a futile gesture."

In the second of the cited cases, a restrictive covenant had been entered into whereby one selling a sawmill and lumber business agreed not to engage, directly or indirectly, in the manufacture or sale of lumber in Lewis county for a period of ten years. Thereafter, he was instrumental in the construction of a new mill and the establishment of a lumber business under the guise of a partnership between his son

and others, including Henry O. Johnson. The purchaser of the mill and lumber business brought an action alleging a conspiracy to violate the restrictive covenant. The trial court found that such a conspiracy existed and enjoined Johnson (not a party to the restrictive covenant) and all the other parties involved in the establishment of the new mill and lumber business from ". . . engaging either directly or indirectly in the manufacture and sale of lumber *in, upon and from the real estate and premises" on which the new mill was located.* We there met squarely the contention that the decree was erroneous in so far as it enjoined the use of real property for a legal purpose, and we approved the portion of the injunction just referred to, holding that a continuation of the business by one of the conspirators would be a perpetuation of the tortious act. We there said:

"Different kinds of injunctions which may be granted to protect a covenantee's rights should be distinguished. Thus we have injunctions directed against the premises; injunctions directed merely against the defendants named in the action and not against the use of the property by other persons; and injunctions directed against the defendants named therein, binding, however, upon certain other persons, not named in the action, by reason of a certain relationship between such persons and defendants."

An attempt is made to distinguish these cases on the basis that both the funeral home and the mill were constructed in furtherance of the conspiracies and were adaptable for use only in the particular business involved. It is urged that in those cases the buildings themselves constituted part of the conspiracies, and for this reason their use by subsequent purchasers of the properties might also be enjoined. We think that this is a distinction without a difference *so far as the parties who participated in the conspiracies are concerned*; what justifies the restraint is the effect which their *use* of the premises will have.

We are left with one other aspect of the injunction ("(a)," *supra*) to consider, *i.e.*, the restraint on any use of the name LaSene in connection with any upholstery business in which the appellant might engage within the area and time indicated.

Appellant urges that he has the right to engage in the up-holstery business as Ray LaSene, because every man has the right to the use of his own name. Among other author-ities, he cites, on this phase of the case, *Merager v. Turnbull, supra,* for in that case, while Bruce Turnbull was not per-mitted to use the one specific location involved in the con-spiracy, he was, by the terms of the injunction entered by the trial court, permitted to engage in the undertaking business in Spokane under his own name, Bruce Turnbull. Appellant urges that he should be permitted to engage in the upholstery business under his own name, Ray LaSene. However, it should be noted that in *Merager v. Turnbull, supra,* Merager did not cross-appeal, and the question of the right of Bruce Turnbull to use his own name in the mortu-ary business in Spokane was not an issue in this court.

■ Indisputably, the cases are legion which state the principle on which appellant relies, that every man has a right to the use of his own name. Appellant, however, over-looks the obligation that goes with the right. A statement by Judge Sage in *Garrett v. T. H. Garrett & Co.,* 78 Fed. 472, 477, (1896), warrants repetition:

"It was contended for the defendant, upon the hearing, that every man has a right to the use of his own name in business, and, as to the order of injunction below restraining defendant from using white paper for its labels, that every person has a constitutional right to use white paper. These propositions, in the abstract, are undeniably true, but coun-sel for the time overlooked the fact that, wherever there is an organic law, wherever a constitution is to be found as the basis of the rights of the people, and as the foundation and limit of the legislation and jurisprudence of a govern-ment, there the mutual rights of individuals are held in highest regard, and are most jealously protected. Always, in law, a greater right is closely related to a greater obliga-tion. While it is true that every man has a right to use his own name in his own business, it is also true that he has no right to use it for the purpose of stealing the good will of his neighbor's business, nor to commit a fraud upon his neigh-bor, nor a trespass upon his neighbor's rights or property; and, while it is true that every man has a right to use white paper, it is also true that he has no right to use it for making

counterfeit money, nor to commit a forgery. It might as well as be set up, in defense of a highwayman, that, because the constitution secures to every man the right to bear arms, he had a constitutional right to rob his victim at the muzzle of a rifle or revolver."

One of the outstanding authorities in the field of unfair competition refers to the foregoing quotation as "a classic, but often neglected statement of the basic rule of personal names." He also points out that, to the principle that every man has a right to the use of his own name,

" . . . the law of unfair competition gradually is adding another—no man may use even his own name in such manner as to injure another unfairly or fraudulently in his business." 1 Nims, Unfair Competition and Trade-Marks (4th ed.) 192, § 67.

As pointed out in *McCoy v. McCoy*, 45 Ohio Op. 246, 60 Ohio L. Abs. 253, 98 N. E. (2d) 435 (1951), the cases restricting a man's use of his own name (apart from contract or estoppel) are based generally upon two recognized exceptions to the principle upon which appellant relies: (1) where the name has acquired a secondary meaning; and (2) where the name has been used for the fraudulent and wrongful purpose of deceiving and confusing the public and injuring a competitor. For discussion of what constitutes a secondary meaning, see *Wright Restaurant Co. v. Seattle Restaurant Co.*, 67 Wash. 690, 122 Pac. 348 (1912), and *Electric Supply Co. v. Hess*, 139 Wash. 20, 245 Pac. 27 (1926); and for discussion of the second exception, see *Petition of Swedish Produce Co.*, 84 F. Supp. 600 (1949), and *McCoy v. McCoy, supra.*

It is to be noted that a willful intent to injure another or purposely to take advantage of an established business reputation need not be present, if it is established that the name of the plaintiff has acquired a secondary meaning. In *Stern Furniture Co. v. Stern,* 52 Ohio L. Abs. 527, 532, 83 N. E. (2d) 804 (1948), despite an express finding of good faith on the part of the defendants, the use of the name Stern was enjoined in connection with their furniture business in a certain district because that name had, "through long and notorious use," come to have a secondary meaning in that

district. (The defendants were later held in contempt for a violation of this injunction. *Stern Furniture Co. v. Stern,* 152 Ohio St. 191, 87 N. E. (2d) 351 (1949).)

Many cases, perhaps most of those which reach the courts, fall in both categories. However, we do not find it necessary to consider the broad question of whether the name LaSene had acquired a secondary meaning with relation to the uphostery business in the Kelso-Longview area, or whether appellant's use of his own name may be enjoined on that basis. We think the trial court's injunction enjoining the use of the name LaSene by Ray LaSene, either with or without the addition of his given name, is amply justified by his record of fraud, deceit, and unlawful conspiracy.

The question as to how far a court of equity may go in restricting the right of a man to use his own name in any particular business appears to have been the source of much recurrent litigation and divergence of opinion. An excellent discussion of the problem, and an extensive collection of cases, may be found in 1 Nims, Unfair Competition and Trade-Marks (4th ed.) 194 *et seq.*, §§ 68-72. Nims caustically refers, in § 68, to certain decisions:

"The attitude of courts of equity toward the right of a man to use his name in business as found in some of the decisions in unfair competition cases, is a curious one. From these decisions one gets the impression that, regardless of the extent of fraud and chicanery indulged in by one using his own name in competition, he may not be deprived of the use of it, even in the particular connotation in which the fraud and confusion has resulted. These decisions offer numerous contrivances for the purpose of mitigating the injurious effect of such fraud, but it is only within the last few years that injunctions have been issued forbidding the use of a personal name completely in the field of endeavor in which the fraud has been committed. The right to liberty, to the pursuit of happiness, to life, to the custody and training of one's children, and many similar rights of great importance may be lost *in toto* by misconduct. Not so with the right to use one's own name. Hitherto it has been held that this right may not be forfeited."

Nims' conclusion that the courts are gradually taking a more realistic view of the obligation that accompanies the

right of an individual to use his own name finds support in numerous cases in which it is held that one must use his own name honestly and not merely as a means of pirating the good will and reputation of a business rival; and that, when an individual has been guilty of bad faith and cannot use his own name without inevitably representing his goods or his services as those of another, he may be enjoined from using his own surname as a business name. See cases cited in 47 A. L. R. beginning on p. 1210 and in 107 A. L. R. beginning on p. 1283; *L. Martin Co. v. L. Martin & Wilckes Co.*, 75 N. J. Eq. 39, 71 Atl. 409 (1908); *Westphal v. Westphal's World's Best Corp.*, 216 App. Div. 53, 215 N. Y. S. 4 (1926), affirmed by *per curiam*, 243 N. Y. 639, 154 N. E. 638 (1926); *P. J. Tierney Sons v. Tierney Bros.*, 130 Misc. Rep. 428, 224 N. Y. S. 144 (1927); *Hoyt Heater Co. v. Hoyt*, 68 Cal. App. (2d) 523, 157 P. (2d) 657 (1945); *Vick Medicine Co. v. Vick Chemical Co.*, 11 F. (2d) 33 (1926); *Champion Spark Plug Co. v. Champion*, 23 F. Supp. 638 (1938); *Petition of Swedish Produce Co., supra*. Referring to the *Westphal* case, *supra*, Mr. Nims states in § 72 of his above cited work:

"The vital part of this decision and indeed of any decree restricting or forbidding the use of surnames in business names is that they do not forbid or limit defendant from use of his name *except* in connection with the trade or business in which he has misused it. If this can be understood, much of the hesitation to give relief in surname cases that is adequate and practical should cease."

No good purpose would be served by an attempt to reconcile the cases cited by appellant and respondent in support of their respective contentions. The conclusions in each case are based upon facts and circumstances peculiar to the case. No inflexible rule can be laid down by which all cases are to be governed; each is somewhat a law unto itself, that is, it is governed by its own circumstances. *Silver Laundry & Towel Co. v. Silver*, 195 S. W. (Mo. App.) 529 (1917); *Flora v. Flora Shirt Co.*, 141 Okla. 58, 283 Pac. 1013 (1930). While it is not our purpose to restate all of the unusual facts and circumstances in this case, it is to be remembered that when appellant purported to open his own

upholstery business his experience in that business was limited to about a year and a half, "off and on," whereas five years' experience is normally required to attain proficiency therein. He left his employment in the logging industry to open that business in a fraudulent conspiracy with his father to violate a restrictive covenant of which he had full knowledge. The business was conducted on premises owned by his father, and appellant paid no rent. All of the tools, supplies, and materials were owned or paid for by his father, who also paid for the advertising, solicited business, prepared estimates, and worked in the shop every day. Appellant's past conduct does not indicate that he has a legitimate desire or even the ability to carry on such a skilled trade in his own behalf.

Under such circumstances, we are not impressed with the contention that appellant should not be deprived of his right to practice "his trade" in the Kelso area under his own name, Ray LaSene. It was under this name that he and his father opened and operated the business from early April, 1953, until closed by the injunction of October 2, 1953. The operation of that business was, the trial court concluded, a deceit and a sham and part of a fraudulent conspiracy to appropriate the good will which Ray LaSene knew had been sold to respondent. He having permitted the use of his name fraudulently and dishonestly, to allow him to continue business under that name would be to allow him to retain the good will acquired through an operation tainted with fraud and deceit. Effective relief under the circumstances here existing requires that he be absolutely forbidden to use the name on which he sought to capitalize, within the area and for the time indicated. If the consequence is that he is denied the rights which an honest competitor with the same surname might possess, he has, as the trial court said, "only himself to blame."

We have held that the appellant may engage in the upholstery business within a five-mile radius of 1012 north Second avenue, Kelso, but not on the premises at that address (and that this right is further restricted as indicated in the following paragraphs); that he may not use the name

LaSene in connection with any upholstery business in any manner prohibited by the injunction issued by the trial court; and that he may not be *assisted, directly or indirectly, by his father.*

Appellant indicates in his brief that he now maintains "his" upholstery business at Carrols, Washington, and intends to relocate it in Kelso as soon as he is permitted to do so. If this be the business conducted at 1012 north Second avenue by the LaSenes immediately prior to the injunction, appellant overlooks the provision of that injunction prohibiting him from

". . . carrying on . . . that certain upholstery business now located at 1012 N. 2nd Ave., Kelso, Washington, and being operated under the name and style of 'Ray LaSene's Upholstery.' "

Appellant may not conduct this business in Kelso under a different name, since the entire assets of the business were found by the trial court to be owned by his father. Nor may he and his father, short of an actual bona fide cash sale, contrive any scheme for the transfer of the business and its assets to appellant, or for the furnishing of other financial assistance to appellant by his father. Operations under the guise of assistance to relatives may not be utilized to violate contracts such as the one between respondent and Andrew LaSene. *Merager v. Turnbull, supra.*

Appellant also urges that the language of the injunction is sufficiently broad to prevent him from engaging in the furniture business under his own name within the area indicated. We do not believe that the trial court intended any such injunction and there is no reason for it except the fact that the furniture and upholstery businesses are frequently closely associated. When the judgment is modified as hereinbefore indicated, any language which might be construed as enjoining the appellant from using his own name in conducting a furniture business or any business other than the upholstery business and the necessary incidents thereto, should be eliminated. Needless to say, any attempt to carry on an upholstery business under the guise of or as an inci-

560

dent to a furniture business would be a violation of the injunction.

██ The injunction will therefore be modified in the particulars hereinbefore indicated, and in all other respects the judgment and decree of the superior court is affirmed. Both parties having prevailed on certain phases of this appeal, each party will bear his own costs in this court.

GRADY, C. J., SCHWELLENBACH, DONWORTH, and WEAVER, JJ., concur.

