**Robert McCART and June McCart, Defendants-Appellants,**

v.

**H & R BLOCK, INC., Plaintiff-Appellee.**

**No. 3–683A167.**

Court of Appeals of Indiana, Third District.

Nov. 14, 1984.

Rehearing Denied Jan. 22, 1985.

R.M. Rhodes, Peru, Daniel J. Harrigan, Bayliff Harrigan Cord & Maugans, P.C., Kokomo, for defendants-appellants.

Frederick E. Rakestraw, Brown, Rakestraw & Kehoe, Rochester, for plaintiff-appellee.

ON PETITION FOR REHEARING

GARRARD, Judge.

We originally dismissed this appeal as moot since the injunction at issue had expired. 462 N.E.2d 1355. On petition for rehearing we have been persuaded the appeal should be addressed on the merits. We therefore grant rehearing and determine the issues presented. After a full hearing on the merits of a complaint filed by H & R Block, Inc. (Block), the Fulton Circuit Court entered its order enjoining Robert and June McCart:

"... from participating in any business, either directly or indirectly, or by acting individually, to file, prepare, or assist in preparing income tax returns within fifty (50) miles of the City of Rochester, Indiana."

The injunction entered on January 18, 1983 was to dissolve on December 15, 1983, two years after June terminated her satellite franchise agreement with Block.

The McCarts now appeal raising essentially three issues:

    I.  Did the covenant not to compete contained in the agreement signed by June apply to Robert so that he could be enjoined from competing with Block?

   II.  Was the covenant unenforceable as a restraint of trade?

 III.  Did the court err by finding Block had no adequate remedy at law?

Before discussing the issues raised by the McCarts, we will summarize the evidence presented to the court before it entered first its preliminary injunction against the McCarts and then the permanent injunction.

Robert first engaged in the preparation of tax returns in 1955 in Kokomo. He opened a tax preparation business in Rochester in 1964 or 1965. In Rochester in 1968, Robert executed a contract with Block because he "felt there was some money to be made in it." In 1969, Robert became a district manager for Block, a position which precluded him from retaining the Rochester office in his name. Accordingly, Robert, as district manager, executed a contract in behalf of Block issuing the Rochester franchise to June. In 1975, June signed a new franchise agreement with Block which continued in force until December 15, 1981 when June terminated the agreement. Robert was familiar with that agreement.

From 1972 until 1979, Robert was involved in the operation of a satellite franchise for Block in Rensselaer. After August 1979, Robert worked at 900 Main Street, the location of the Block franchise in Rochester. While there he performed management tasks, represented to others that he was the manager of the office, conferred with representatives of Block, attended meetings held by Block, and prepared tax returns on forms furnished by Block. At the office at 900 Main Street, Robert also engaged in an accounting business separate from that related to Block. However, the McCarts' own joint income tax returns for the years 1978 through 1981 show that nearly all of their income was from the Block business. For the years 1978 and 1979, Robert reported on his Schedule C that his business was tax preparation under the business name of H & R Block at 900 Main Street. June used

that description on her Schedule C for 1980 and 1981.

On December 15, 1981, June wrote a letter to Kathy Heise, district manager for Block, giving notice that, due to arthritis, she would not be able to continue the satellite operation in Rochester after December 31, 1981. Earlier in December, the McCarts had picked up supplies ordered from Block in September for the preparation of tax returns in early 1982.

Shortly after sending her letter of cancellation, June sent the following letter to people who had been clients of the Block office in Rochester:

"DEAR CLIENT:

After being associated with H & R Block in the Rochester locality for 15 years, I have arrived at a decision which I feel I must make—dissociate [sic] myself from H & R Block.

In the past the company has issued a standard schedule of charges which we were told to go by and these charges have been increasing at a rate I did not feel was warranted. It is a fact the company's market has been shrinking in recent years and its revenue has increased largely because of the result of higher fees. Now, this year they are talking about a 15% increase over last year.

This, I feel, is out of order with the economic and unemployment situation in our area, and, I am cancelling my contract. I will assist my husband in his tax service in the future.

Thank you,

/s/ June McCart

June McCart"

June sent each letter in an H & R Block envelope with the name "H & R Block" blacked out but with Block's slogan "The Income Tax People," remaining. The name "Community Tax Service" appeared on each envelope.

A letter written by Robert also was enclosed in each envelope reading as follows:

"COMMUNITY TAX SERVICE

900 Main Street

Rochester, Indiana 46975

Phone (219) 223–6526

223–3138

"DEAR TAXPAYER:

On January 2, 1982, I will open my tax preparation office at the above address and location using the name Community Tax Service.

We will continue to offer the same competent service, guarantee, etc., and, at the same location with the same personnel. About the only change that is being made is the name.

Our prices will not increase this year, in fact, we are offering a discount of 10% off what you may have paid last year. Our staff is trained in the new tax laws and how they affect you. The earlier you bring us your material the sooner you will receive your refund, or, know just where you stand.

May we expect to see you soon, or, phone us for an appointment.

Thank you,

/s/ Robert H. McCart

Robert H. McCart"

After the cancellation of the agreement, Robert spoke to employees of the post office, requesting that all mail addressed to 900 Main Street be delivered there even if addressed to Block. Block opened a separate office for tax preparation at 802 Main Street. Paula Garcia was the new franchisee. When she called "Information" to check the telephone number for Block that was being given, she was asked whether she wanted the 900 or 802 Main Street address. Customers occasionally would call Block but would inadvertently reach the 900 Main Street office of the McCarts where they would make an appointment. When the customers then went to the 802 Main Street office to have their taxes prepared, that office would have no record of the appointment.

*I. Propriety of injunction against Robert.*

Robert contends that because he did not sign the satellite agreement with Block containing the covenant not to compete, the trial court erred by enjoining him from competing with Block. We disagree.

In the specific findings entered in support of the preliminary injunction, the court stated, *inter alia:*

"19. That the defendants, Robert McCart and June McCart, acted together to breach the terms of the satellite franchise agreement executed between the defendant, June McCart, and the plaintiff by means of the various acts set forth above.

20. That the defendants, Robert McCart and June McCart, acting together, have endeavoured to trade upon the going concern value, goodwill, and national advertising efforts of the plaintiff, a valuable property right of the plaintiff in violation of the terms of the satellite franchise agreement."

Two of the court's conclusions were:

"2. That by reason of the joint efforts of the defendants to breach the satellite franchise agreement between the plaintiff and the defendants, the defendants should be enjoined from engaging in the business of preparing federal and state income tax returns.

3. That because the defendants have attempted to establish an income tax preparation business relying upon the supplies, slogans, customer listing, telephone listings, and mail in which the plaintiff, H & R Block has a proprietary interest the defendants should be enjoined from engaging in the business of preparing federal and state income tax returns."

The court's permanent injunction reaffirmed Block's entitlement to enforcement of the covenant not to compete and generally adopted the court's previous findings as support.

Robert's argument is a logical one: he did not sign the satellite agreement; he therefore should not be bound by its restrictive covenant, especially in light of our courts' disfavor with restraints on trade. *See Captain and Company, Inc. v. Towne* (1980), Ind.App., 404 N.E.2d 1159, 1161. While we find no Indiana cases directly addressing this issue, our search of the law in other states reveals:

"... that the rule that a stranger to a covenant may be enjoined from aiding and assisting the covenanter in violating his covenant is supported by an overwhelming weight of authority. *See* 43 C.J.S. Injunctions, Section 83, p. 569; 28 Am.Jur. Injunctions, Section 104, p. 298; Annotation, 94 A.L.R. 341, 345 (1934), which sustain this pronouncement of the rule."

*West Shore Restaurant Corp. v. Turk* (Fla.1958), 101 So.2d 123. In *West Shore*, a corporation of which Turk was a shareholder sold a restaurant managed by Turk to West Shore. As part of the consideration for the sale, Turk signed a covenant not to compete directly or indirectly with West Shore. Within the restricted period and area, Turk's father and a former associate purchased a restaurant. Turk played a dominant role in the purchase and supplied part of the capital. Turk was hired to manage the commissary supplying the restaurant and he exerted a definite influence on the operation of the restaurant. The Florida Supreme Court remanded to the trial court for an order, not only enjoining Turk from further breaches, but also enjoining his father and associate from aiding and assisting any breach.

In *Madison v. La Sene* (1954), 44 Wash.2d 546, 268 P.2d 1006, 44 A.L.R.2d 1145, the father had sold his upholstery business to Madison and signed a covenant not to compete. The son, who had not signed the contract of sale, was later enjoined from operating a competing business in the location of his father's old business, from using a business name similar to that used by his father, and from being assisted, directly or indirectly, by his father. The Washington Supreme Court said, however, that the son could not be held to the same area restriction as his father.

"He was not a party to the restrictive covenant and cannot be bound by its terms *except insofar as his activities constitute a conspiracy for its breach, which is, in effect, a conspiracy for unfair competition.*" (our emphasis)

268 P.2d at 1009.

In *Arwell Division of Orkin Exterminating Company v. Kendrick* (1971), 131 Ill.App.2d 632, 267 N.E.2d 352, John Kendrick was employed by Arwell for 18 years. As part of his employment contract he signed a covenant not to compete with Arwell within a certain area and for a certain time. After his resignation and within the restricted area and time, his wife Marguerite opened a business competing with Arwell. The trial court enjoined the wife who appealed on the basis she had not signed the restrictive covenant. The Illinois Court of Appeals affirmed, stating:

"Marguerite Kendrick was in fact and law a stranger to the employment contract. However she was not a stranger to the transactions and events from which it may be inferred she knowingly participated and aided in the evasion or violation of the restrictive covenant. We know of no rule of law which holds that appellant merely because she was not a party to the employment agreement may thereby avoid the consequences of her conduct designed to aid in the violation thereof nor does appellant cite any cases to support this position. A party who induces another to violate his contract may be restrained from such conduct. *See Victor Chemical Works v. Iliff,* 299 Ill. 532, 132 N.E. 806 and *Norman v. Local No. 4, etc.,* 40 Ill.App.2d 422, 189 N.E.2d 687. If a party knowingly participates or aides another in the violation of the contract such conduct may be regarded as inducement.

As is disclosed by the evidence it may be inferred that Marguerite Kendrick had full knowledge of the restrictive covenant and of her husband's intentions to compete in violation of such restriction if he could. Although appellant claims that the Kendrick Exterminating Business established in LaSalle, was her own business there is substantial evidence from which the contrary may be inferred justifying the inference that appellant was acting in concert with her husband to evade the duty imposed upon him by the covenant. The funds which John Kendrick received from the profit sharing plan went into the business. John Kendrick helped select a building, truck, and was otherwise involved in the business all with the knowing participation of appellant. Another employee of Arwell was solicited to terminate his employment with Arwell and come to work for the Kendrick Exterminating Business. While the evidence is conflicting whether he was employed by John Kendrick or Marguerite Kenderick [sic] the conflict illustrates the basic reason for the propriety of the trial court's action. Marguerite Kendrick was only nominally the proprietor of an exterminating business in LaSalle. As between John and Marguerite Kendrick it was a matter of form only and not of substance. She was in fact the alter ego of John Kendrick and in our opinion the trial court correctly held that her conduct of the business was a thinly veiled subterfuge designed to avoid her husband's obligation under the contract."

267 N.E.2d at 354.

For additional cases enjoining persons who had not signed a covenant not to compete, *see Temporarily Yours—Temporary Help Services, Inc. v. Manpower, Inc.* (Fla. App.1979), 377 So.2d 825 (enjoining corporation engaged in competing business where president of corporation had signed covenant not to compete and corporation apparently existed for the purpose of assisting the president in his breach of the covenant); *Sulmonetti v. Hayes* (1964), 347 Mass. 390, 198 N.E.2d 297 (enjoining wife of seller of fuel oil business from operating business competing with buyer although only seller had signed covenant not to compete); *Chemical Fireproofing Corporation v. Bronska* (Mo.Ct.App.1976), 542 S.W.2d 74 (enjoining wife and corporation of which husband was president from aid-

ing husband in the breach of covenant not to compete which only he had signed); *Bolz v. Myers* (1982), Mont., 651 P.2d 606 (although only wife and son signed contract for sale of business with non-competition provision, husband was bound also because the wife and son were merely contractual figureheads; husband held himself out as the true owner, he conducted the sale negotiations and he had the familiarity with the customers, contracts and routes); *Wells v. Powers* (Tex.Civ.App.1962), 354 S.W.2d 651 (non-competition provision in contract for the sale of a business permitted injunction of third party who later employed seller in a competing business); *LeMaine v. Seals* (1955), 47 Wash.2d 259, 287 P.2d 305 (enjoining corporation as the alter ego of person who had signed covenant not to compete).

■ As the above cases amply establish, it is not necessary to show Robert's signature on the agreement before enjoining him from assisting the breach of the agreement by June. The evidence supports the finding that Robert acted together with June to breach her agreement with Block. The rationale for extending the injunction to cover both June and Robert was well stated by the trial court:

> "If this Court were to enjoin June only and allowed Robert to continue the tax preparation trade at the same site and with the same customers the Court would be ignoring the business realities of the situation, frustrating the proper purpose of paragraph 11 of the contract, and affording June McCart indirect competition and benefit in specific violation of the contract terms. The McCarts treated the operation as their joint business (see their personal income tax returns) and held themselves out to the public that way. This Court's order will treat them in the manner they operated."

Contrary to Robert's argument, the trial court's decision does not rest upon the existence or non-existence of a contractual relationship between Robert and Block. Robert knowingly participated and aided June in the violation of her contract with Block. *See Arwell v. Kendrick, supra.* Their cooperative conduct amounted to mere subterfuge designed to avoid June's obligation under the contract. *Id.* The court did not err by including Robert within the scope of the injunction.

*II. Enforceability of the covenant not to compete.*

Paragraph 11 of the satellite franchise agreement signed by June provides, in relevant part:

> "11. FRANCHISEE'S COVENANT NOT TO COMPETE.
>
> Franchisee covenants that (i) during the term hereof he will not compete, directly, indirectly, whether as an owner, stockholder, partner, officer, director or employee, with Block or Block's franchisees in the business of preparing tax returns or performing related services in, or within 250 miles of, the franchise territory, and (ii) for a period of two years after the termination, or the transfer or other disposition of this franchise, he will not so compete as aforesaid in, or within 50 miles of, the franchise territory, but if Franchisee does so compete (whether by reason of the unenforceability of such covenant not to so compete or otherwise), Franchisee shall pay Block royalties in the manner and amount set forth in paragraph numbered 4 hereof with respect to those revenues, if any, derived by Franchisee from its preparation of income tax returns within said 50 mile limit, such payments to continue for two years or for the balance of the then existing term (whether initial or renewal) of this Agreement whichever is longer. The parties expressly acknowledge and agree that such payments shall not affect the rights or remedies Block may have, at law or in equity (including the right to seek injunctive relief), against Franchisee by reason of such competition by Franchisee."

June contends the covenant is void as a restraint on trade and unreasonable as to its territorial limitation. She contends that, because she did not learn any of Block's trade secrets, confidential information or

customer lists during the term of the agreement, Block had no recognizable, protectible interest that could be covered by the covenant consistent with public policy.

■ It is true that a covenant in general restraint of trade is void as against public policy. *Raymundo v. Hammond Clinic Association* (1983), Ind., 449 N.E.2d 276; *Bennett v. Carmichael Produce Company* (1917), 64 Ind.App. 341, 115 N.E. 793. However, a restraint which is clear and specific carries no such presumption of disfavor, *Buanno v. Weinraub* (1948), 226 Ind. 557, 81 N.E.2d 600, and will be enforced if reasonable with respect to the covenantee, the covenantor and the public interest. *Frederick v. Professional Building Maintenance Industries, Inc.* (1976), 168 Ind.App. 647, 344 N.E.2d 299. The enforceability of the covenant depends upon the facts and circumstances surrounding each case including the legitimate interests of the covenantee and the protection provided in terms of the duration and geographical limitation of the covenant. *Id.* While most often the enforceability of a covenant not to compete arises in the context of a sale of a business or a contract between employer and employee, "The rule is well established that such a clause is good if it is ancillary to any lawful contract subject, of course, to the test of reasonableness of the covenant and whether it is inimical to the public welfare." *H & R Block v. Lovelace* (1972), 208 Kan. 538, 493 P.2d 205, 50 A.L.R.3d 730 (citations omitted); *Milgram v. Milgram* (1938), 105 Ind. App. 57, 12 N.E.2d 394.

■ Before we can affirm the enforcement of this covenant not to compete, we first must determine the nature of Block's protectible interest. In the satelite franchise agreement, Block granted to June "exclusively, the right to operate an income tax return preparation service and to perform 'related services' under the name and service mark 'H & R Block' " in Rochester. A service mark is a form of property and has property rights associated with it. *Jellibeans, Inc. v. Skating Clubs of Georgia, Inc.* (11th Cir.1983), 716 F.2d 833. In ex-

change for the property right granted to her by Block, June agreed, *inter alia,* to pay Block a percentage of the gross receipts from the preparation of income tax returns during the term of the agreement and to not compete with Block for two years thereafter.

The rationale for entering a contract for the use of a service mark is to draw on the reputation associated with the name in order to attract customers by identifying the services of one person and distinguishing them from services of another. *Health Industries, Inc. v. European Health Spas* (D.C.S.D.1980), 489 F.Supp. 860. Robert entered the initial agreement with Block because "there was money to be made in it." The use of the name "H & R Block" allowed June to take advantage of the public's recognition of that name.

June's argument is essentially that the customers at the H & R Block office in Rochester were hers, not Block's, and that therefore the courts should not enforce the covenant which would prevent her from providing services for her customers. Her argument must fail because it overlooks the value of the service mark for which she bargained.

■ When a person sells a business to another, the seller often will agree not to compete with the buyer for a certain period of time within a certain area. Such agreements reflect the value of the customers' affiliation with the particular business which is part of the bargain sought by the buyer. This "good will" is the protectible interest upon which the covenant not to compete focuses. *Donahue v. Permacel Tape Corporation* (1955), 234 Ind. 398, 127 N.E.2d 235. If the seller competed with the buyer for customers, the buyer would not receive all that had been sold to him or her. *See Tobin v. Cody* (1962), 343 Mass. 716, 180 N.E.2d 652, 656.

A similar concept of customer affiliation prevails here. Block has a valuable property right in its service mark. The value is reflected by customers' name recognition and resultant use of the service offered

under the Block name. June was willing to pay for that customer affiliation as would a buyer of a business. In return, Block gave June the right to use that service mark and benefit from the customers it drew as long as the contract terms were met. By including the covenant not to compete in the agreement, Block preserved the value of that property right to itself alone after the termination of the agreement.

■ Despite June's present contention to the contrary, at the time she entered the contract with Block, both parties understood that the bargain for use of the Block service mark was a bargain for customers who would be attracted to the Block name. She cannot now be heard to claim Block has no protectible interest in those customers she gained while offering services under that name. The essence of our view is captured in *West Shore Restaurant Corporation v. Turk, supra,* a sale of business case where the Florida Supreme Court cited language of the Colorado Supreme Court in *Barrows v. McMurtry Mfg. Co.* (1913), 54 Colo. 432, 131 P. 430:

> "Where one is so lost to a sense of moral obligation as to accept a full consideration for his stock in trade and good-will, upon express condition that he refrain from again entering that business for a limited time, within a certain territory, and then immediately, having pocketed the fruits of the agreement, deliberately and wilfully ignores the controlling condition thereof, courts should certainly not hunt for legal excuse to uphold him in such moral delinquency."

131 P. at 436.

■ While we conclude Block did have a protectible interest in the customers June serviced under the Block name, we still must determine the reasonableness of the covenant.[1] The subject of area limitations in such covenants has been discussed in this state in the context of employment contracts. The law developed from these

cases is instructive here. Restrictive covenants in employment contracts are invalid if they restrict the employee from competing in an area greater than necessary to protect the good will of the employer; conversely, "... such covenants will be upheld, if limited to the area in which operation of the employee's activity was related to the good will of the employer's business." *Donahue v. Permacel Tape Corporation, supra,* 127 N.E.2d at 238. In *Donahue,* the court found the covenant invalid because it restricted the employee from competing anywhere within the United States or Canada even though his area of employment was limited to northern Indiana.

"The point that was being underscored in *Donahue* is that reasonableness is to be determined upon the totality of the circumstances. It is the interrelationship of the considerations of protectible interest, time, space, and proscribed activity that make[s] a particular covenant reasonable or unreasonable." *Frederick v. Professional Building Maintenance Industries, Inc.* (1976), 168 Ind.App. 647, 344 N.E.2d 299, 302. In *Frederick,* we reversed an order enjoining an ex-employee from engaging in the contract building maintenance business in an eight county area for ten years from the date he terminated his employment. The covenant was unreasonable because the employee only had operated in two counties. Thus the covenant prohibited activity beyond the area within which the employer's protectible interest had been of value to the employee.

Two cases finding valid covenants are *Buanno v. Weinraub* (1948), 226 Ind. 557, 81 N.E.2d 600 and *4408, Inc. v. Losure* (1978), 175 Ind.App. 658, 373 N.E.2d 899. In *Buanno,* the court upheld the enforcement of a covenant signed by an employee of a janitorial service in Ft. Wayne prohibiting him from competing anywhere within Allen County for three years after he terminated his employment. In *Losure,* we

---

1. The McCarts' argument focuses upon the space limitation of the covenant and, accordingly, so does our response. Nevertheless, it must be recalled that in assessing the reasonableness of such restraints time, space and purpose are interrelated and judgment is based upon the whole. *Frederick, infra.*

reversed a declaratory judgment that a restrictive covenant was invalid. The employee of a coffee service agreed not to compete during his employment and for three years thereafter in any area he serviced during his employment. We held this covenant, properly limited as it was to the employee's area of work, was enforceable to protect the business and good will of the employer.

 The evidence here shows that 22 miles was as far as any customer had traveled to use June's services at the H & R Block office in Rochester. June argues that the 50 mile limitation imposed upon her is therefore unreasonable. However, focusing again on Block's protectible interest and using the above cases as a guide, we cannot agree with her. In the above cases, the employees would go to the customers to sell a product or provide a service thus defining a specific area of activity. Here Block's protectible interest was the customer recognition of its service mark and the year to year affiliation those customers might develop with a particular office. Unlike the above cases, the nature of this business requires that the customers go to the H & R Block office to have their tax returns prepared. Thus the area influenced by the customer affiliation is broader and less specific, depending as it must on where the competing office is established. For instance, the McCarts might open an office 44 miles from Rochester and still draw the same customers who previously had traveled 22 miles to have their taxes prepared in Rochester. Block had as much right to protect its interest in those customers as it did customers in Rochester. The McCarts had a list of all the customers who had used their service at the H & R Block office in Rochester. They used that list to take advantage of the customer affiliation they had built on the Block name during their combined thirteen years as Block franchisees. It was not unreasonable to recognize Block's pro-

tectible interest and to enforce the covenant against the McCarts as it was written restricting competition for two years within a 50 mile radius of Rochester.

The McCarts' final contention is that Block had an adequate remedy at law and therefore was not entitled to injunctive relief. They merely make reference to Paragraph 11 of the agreement which contains a provision for the continued payment of royalties in the event the franchisee does compete in violation of the covenant.[2] They cite no authority and offer no argument to support their allegation of error. The issue is therefore waived. *American Family Insurance Group v. Blake* (1982), Ind.App., 439 N.E.2d 1170.

Affirmed.

STATON, P.J., and HOFFMAN, J., concur.

---

**2.** The same paragraph provides that the payments shall not affect Block's right to seek in-

junctive relief.