Ronald K. NORLUND, O.D., Dawn Denise Norlund, O.D., and Indiana Cataract and Laser, P.C., Appellants,

v.

Joseph F. FAUST, M.D., Individually and d/b/a Faust Eye Center and Faust Eye Center, P.C., Appellees.

No. 27A02–9512–CV–753.

Court of Appeals of Indiana.

Feb. 4, 1997.

Michael A. Wukmer, John J. Morse, Ice Miller Donadio & Ryan, Indianapolis, Michael J. Kiley, Joseph H. Certain, Kiley Kiley Harker Rogers Michael & Certain, Marion, for Appellants.

Richard A. Huser, Jeffrey R. Gaither, Sandra Boyd Williams, Locke Reynolds Boyd & Weisell, Indianapolis, for Appellees.

## OPINION

SULLIVAN, Judge.

Appellants, Dr. Ronald Norlund (R. Norlund), Dr. Dawn Norlund (D. Norlund) and Indiana Cataract and Laser, P.C. (ICL) appeal the trial court's December 8, 1995, findings, conclusions and order granting a preliminary injunction against them on behalf of appellees, Dr. Joseph Faust (Faust) individually and d/b/a Faust Eye Center (Eye Center) and Faust Eye Center, P.C. (Faust, P.C.).

Appellants present five issues for review which this court restates as follows:

1. Whether the trial court erred in finding that the actions of appellants breached the covenant not to compete;

2. Whether the trial court erred by enforcing a covenant not to compete which was in contravention of an Indiana statute;

3. Whether the trial court erred in allowing Faust Eye Center, P.C. to enforce the terms of the agreement entered into by Faust Eye Center;

4. Whether the trial court erred in finding the terms of the covenant not to compete reasonable as against appellant, R. Norlund; and,

5. Whether the trial court erred in finding the terms of the covenant not to compete reasonable as against appellants, D. Norlund and ICL.

Pursuant to Trial Rule 52(A), the trial court entered findings and conclusions.

According to those findings, Appellant R. Norlund is a licensed optometrist who lives in Marion, Indiana. His wife, Appellant D. Norlund, is also a licensed optometrist. R. Norlund is well-known professionally in northern Indiana; he received his degree from Indiana University School of Optometry and completed a residency at the Bascom–Palmer Eye Institute Center in Florida. R. Norlund is active in numerous optometric societies, associations and committees in northern Indiana. Although D. Norlund is a qualified optometrist in her own right, R. Norlund's skills are superior to those of his wife—a fact well-known to the northeastern Indiana optometric community.

Appellee Faust is an ophthalmologist previously d/b/a Faust Eye Center. In December 1993, Faust incorporated as Faust Eye Center, P.C. Faust Eye Center derived most of its business from the general public prior to 1991. In 1991, Faust decided that he would focus on obtaining business through referrals from optometrists. He felt that he could create an amiable relationship between himself and optometrists who would refer their patients to him for secondary eye care. In order to facilitate the relationship between himself, an ophthalmologist, and the optometrists, Faust decided to hire a highly-skilled high-profile optometrist. That person would perform duties as a medical optometrist and as a optometric liaison, building referral relationships with other area optometrists.

R. Norlund learned of Faust's plan and wrote Faust about the employment opportunity. R. Norlund noted that he had the medical skills as well as the outgoing personality to fulfill the needs of this new position.

Shortly after R. Norlund's letter to Faust in May, 1991, the parties began negotiating a contract. During the negotiations, R. Norlund's legal counsel wrote to Faust's counterpart noting that the contract which they were contemplating would be in violation of I.C. 25–1–9–5. The statute makes it illegal for an optometrist to accept employment from anyone other than another optometrist or a corporation formed by an optometrist. Faust offered to alter the agreement so as not to render it in contravention of the statute, but,

"[u]ltimately, R. Norlund chose not to ... alter the agreement." Record at 404.

The parties entered into an Employment Agreement on or about July 27, 1991. Pursuant to the Employment Agreement, the duties of R. Norlund were defined as follows:

"Section 2 **Duties** . . .

(i) serving as an Optometric Liaison including, but not limited to, building a relationship for the Eye Center with potential referring optometrists for non-primary care ocular services (which would include diagnosis and management of ocular disease and ocular surgery) to be performed by the Eye Center, management of the referral relationship and providing education and assistance to potential referring optometrists;

(ii) serving as a Medical Optometrist including, but not limited to, diagnosis and management of ocular disease for patients of the Eye Center; and

(iii) [s]uch additional or different duties as may be prescribed, from time to time, by the Eye Center."

Record at 583.

The Agreement also contained a covenant not to compete which provided in relevant part:

Section 7 **Post Employment Covenant Not to Compete.** For a period of two (2) years after the termination of this Agreement for any reason by either party, whether voluntarily or involuntarily, including by expiration of its term:

(i) Dr. Norlund shall not contact, directly or indirectly, any Referring Optometrist with regard to ocular care services or techniques or with regard to former, current or potential patients of the Referring Optometrist (a "Referring Optometrist" is an optometrist who has referred patients to the Eye Center while Dr. Norlund was employed by the Eye Center);

(ii) Dr. Norlund shall not discuss with a Referring Optometrist (whether the discussion is initiated by him or by the Referring Optometrist) any ocular care services or techniques or any

former, current or potential patients of the Referring Optometrist;

(iii) Dr. Norlund shall not perform any services as an Optometric Liaison (*viz.* services substantially similar to those described in clause (i) of Section 2) for, or in association in any way with, any ophthalmologist in the counties specified on Exhibit A.

(iv) Dr. Norlund shall not perform any services as a Medical Optometrist (*viz.* services substantially similar to those described in clause (ii) of Section 2) for, or in association in any way with, any ophthalmologist in the counties specified on Exhibit A.

Record at 587.

R. Norlund began his employment with Faust in July 1991. During the time of R. Noland's employ, Faust's optometric referrals increased from 20% to 80–90% of his business. This increase was due to R. Norlund's activities developing the network on behalf of and funded by Faust. The network grew throughout northeastern and central Indiana, and in fact, in 1994, 122 optometrists in the area referred patients to Faust Eye Center for treatment.[1]

On December 30, 1993, Faust incorporated Faust Eye Center as Faust Eye Center, P.C. Prior to incorporation, the Eye Center had been a sole proprietorship. Subsequent to incorporation, Faust was the sole shareholder, officer and director of Faust Eye Center, P.C. After the change, R. Norlund continued to work for and received compensation from the Eye Center in the same manner.

In late 1993 or early 1994, R. Norlund expressed interest in renegotiating his contract with Faust. Negotiations commenced and lasted throughout 1994 and early 1995. By May 1995, it became doubtful that the parties would reach an agreement; therefore, Faust issued a written notice of nonrenewal of R. Norlund's employment agreement on May 23, 1995. The negotiations culminated in a heated exchange on July 26, 1995 whereby R. Norlund's employment with Faust ended with R. Norlund threatening to take 500 to 700 cataract surgeries a year away from the Eye Center.

The same day that R. Norlund left Faust's employ, he issued a letter to optometrists in northeastern and north central Indiana on stationery bearing his name and home address. The letter concerned an ocular care device known as an Excimer Laser. The letter read in part:

"The purpose of this letter is to determine how much interest exists among doctors of optometry practicing in northeastern and north central Indiana regarding an optometrically-owned Excimer Laser center. Over the past few months, approximately a dozen doctors of optometry have contacted me and discussed their interest in preparing their practices in optometry for the approval of photorefractive keratectomy. Due to the increasing interest in this subject and a desire to position optometry in a leadership role, I decided to educate myself on the issues and the options.... Some of your patients are going to want to consider this new refractive option and some will be better candidates than others. How you manage this group of future patients is the aspect yet to be determined. Will you once again be forced to accept the terms dictated by local competing ophthalmologists?"

Record at 407.

Within two weeks of leaving Faust Eye Center, R. Norlund made an interest-free loan of $30,000 to D. Norlund in order to establish Indiana Cataract and Laser, P.C. (ICL). ICL was established as a business to provide secondary eye care based upon optometric referrals. ICL is essentially identical in nature to Faust Eye Center.

D. Norlund is the sole shareholder in ICL. She was previously working full-time as a primary care optometrist in Northern Indiana. She had no experience running a secondary care facility and had never received a secondary care referral from another optometrist before August 1995.

R. Norlund has no ownership interest in ICL. He has never seen a patient there, nor

---

1. It is upon these 122 optometrists (listed in the record as defendants' exhibit B) from whom Faust obtained referrals that the covenant not to compete's restrictions are based.

has he ever been in the building when a patient was present. He is not involved in ICL's day-to-day operations. He is not an ICL employee and has never received compensation from ICL.

The above notwithstanding, R. Norlund contacted Dr. Jay McGarvey (McGarvey), a colleague from Bascom–Palmer about an opportunity with ICL. McGarvey eventually accepted a position with ICL working as a secondary care/medical optometrist. McGarvey also functions as an optometric liaison for ICL. He solicits optometric referrals from optometrists in northeastern Indiana in much the same way R. Norlund did when working for Faust. ICL has received about 30 to 100 patients, most from nine optometrists who previously referred patients to Faust.

Although R. Norlund has not performed services as an optometric liaison or medical optometrist in the proscribed area, R. Norlund has done several things on behalf of ICL. He contacted McGarvey and advised him of the opportunity in the market in northeastern Indiana. He interviewed ophthalmologists and contacted hospital administrators concerning privileges at hospitals. He told one ophthalmologist, Dr. Orr, that ICL's referral network would consist of optometrists with whom he had developed relationships during his time with Faust. R. Norlund also assisted D. Norlund in purchasing equipment for ICL and painting and moving office furniture.

The trial court concluded that the contract between R. Norlund, an optometrist, and Faust, an ophthalmologist violated I.C. 25–1–9–5. The statute provides that an optometrist who accepts employment from anyone other than another optometrist or a corporation formed by an optometrist is subject to disciplinary action. Although the trial court found the contract violated the statute, the court found that the contract was not void.

The court further concluded that Faust had established a prima facie case that the

covenant was enforceable. It found that the covenant had been breached directly by R. Norlund and indirectly by R. Norlund in concert with ICL and D. Norlund. The trial court noted that the evidence suggests that R. Norlund is contacting optometrists in an effort to gain optometric referrals for ICL.[2] The trial court said that the evidence indicated that ICL and its employees had been acting in concert with R. Norlund to achieve indirectly what he could not achieve directly, and it finally concluded that R. Norlund's written communication with optometrists concerning the establishment of an Excimer Laser center owned by optometrists violated the covenant.

Upon the preceding determinations and conclusions, the trial court entered a preliminary injunction which enforced parts of the covenant not to compete against R. Norlund, D. Norlund, and ICL. The appellants were enjoined from:

"contacting, directly or indirectly, any of the 122 referring optometrists listed on Defendants' Exhibit I admitted into evidence with regard to former, current or potential patients of said referring optometrists[;]

... discussing with any of the 122 referring optometrists listed on Defendants' Exhibit I admitted into evidence (whether the discussion is initiated by them or by a referring optometrist) any former, current or potential patients of the referring optometrists[; or]

... performing any services as an optometric liaison or medical optometrist, as those terms are defined in the Employment Agreement admitted into evidence in this case as Defendants' Exhibit B for, or in association in any way with, any ophthalmologists in the counties specified on Exhibit A to the Employment Agree-

2. The trial court also concludes that the evidence suggests that R. Norlund has been acting as an optometric liaison in direct contradiction with its finding that R. Norlund has not been acting as an optometric liaison. However, because this court decided that sections iii and iv of the covenant not to compete are not enforceable, we need not

address this apparent inconsistency. In any event we would note that a recitation to the effect that the evidence "suggests" or "indicates" the existence of a particular fact is not adequate to constitute a finding of that fact. *See Perez v. United States Steel Corp.* (1981) Ind., 426 N.E.2d 29.

ment admitted into evidence as Defendants' Exhibit B."

Record at 417–18.

## I.

### STANDARD OF REVIEW

■■■ The granting of a preliminary injunction is within the discretion of the trial court, and this court's review is limited to the determination of whether or not the trial court clearly abused that discretion. *Harvest Ins. Agency v. Inter-Ocean Ins. Co.* (1986) Ind., 492 N.E.2d 686; *Fumo v. Medical Group of Michigan City, Inc.* (1992) Ind. App., 590 N.E.2d 1103, *trans. denied.* When determining-whether or not to grant a preliminary injunction, the trial court is required to make special findings of fact and state its conclusions thereon. Ind.Trial Rule 52(A). When findings and conclusions are made, the reviewing court must determine if the trial court's findings support the judgment. *Vanderburgh County Bd. of Comm'rs v. Rittenhouse* (1990) Ind.App., 575 N.E.2d 663, 665, *trans. denied.* The judgment will be reversed only when clearly erroneous, i.e., when the judgment is unsupported by the findings and the conclusions entered on those findings. *DeHaan v. DeHaan* (1991) Ind. App., 572 N.E.2d 1315, 1320, *trans. denied.* Findings of fact are clearly erroneous when the record lacks evidence or reasonable inferences from the evidence to support them. *Id.* To determine whether the findings or judgment are clearly erroneous, we consider the evidence only in the light most favorable to the judgment. *Id.* We also construe the findings together liberally in favor of the judgment. *In re Estate of Palamara* (1987) Ind.App., 513 N.E.2d 1223, 1227, *reh'g denied; e.g., Matuga v. Matuga* (1992) Ind. App., 600 N.E.2d 138, 140, *trans. denied.*

■■■ When considering the granting or denial of a preliminary injunction, the trial court's discretion is measured by several factors. These factors include:

1) Whether or not the party seeking the injunction has an adequate remedy at law;

2) Whether granting the injunction would disserve the public interest;

3) Whether the party has established a reasonable likelihood of success at trial; and,

4) Whether the injury to the party seeking the injunction outweighs the harm to the party who would be enjoined.

*Indiana State Bd. of Public Welfare v. Tioga Pines Living Center, Inc.* (1994) Ind.App., 637 N.E.2d 1306, 1311, *reh'g denied; Fumo, supra,* 590 N.E.2d at 1108. Appellant challenges the trial court's assessment of these factors.

■■■ A party seeking a preliminary injunction must establish a prima facie case at the preliminary injunction hearing. The party is not required to show that he is entitled to relief as a matter of law, nor is he required to prove and plead a case which would entitle him to relief upon the merits. *Rees v. Panhandle Eastern Pipe Line Co.* (1978) 176 Ind.App. 597, 377 N.E.2d 640, 646. Consequently, this court, in reviewing the decision of the trial court, must determine "whether the likelihood of success is so improbable as to render the trial court's determination erroneous as a matter of law." *Family and Social Services Admin. v. Community Care Centers, Inc.* (1994) Ind.App., 641 N.E.2d 1012, 1019, *reh'g denied.*

## II.

### FAUST'S REMEDIES AT LAW ARE INADEQUATE

■■■ Appellants first argue that Faust has not carried his burden of showing that his remedies are inadequate at law and that he will suffer irreparable harm. It is true that a party seeking an injunction must show irreparable injury. *Id.* However, the irreparable injury requirement does not demand that Faust point to specific losses in his business. As stated by the trial court: "[i]njunctive relief is appropriate if it is more practical or efficient than that afforded by law". Record at 414 (citing *Community Care Centers, supra* 641 N.E.2d at 1017). In fact, if Faust could point to a specific dollar amount of losses, then a remedy at law would be sufficient. *See Welcome Wagon v. Haschert* (1955) 125 Ind.App. 503, 127 N.E.2d 103. When a covenant not to compete of this

nature is breached, it follows that the employer will suffer harm. It would be pure speculation to place a dollar amount on the damages, and an injunction against the prohibited behavior is the most efficient way to lift the burden of that harm from the shoulders of the employer who contracted so as not to suffer such harm. *Id.* The trial court properly concluded that the remedies at law that were available to Faust would be insufficient.

The trial court also impliedly concluded that R. Norlund was violating the covenant not to compete directly and indirectly through D. Norlund and ICL. Upon examination of the record, this court cannot say that it was unreasonable for the trial court to have so concluded.

The trial court writes that "R. Norlund has made written contact with optometrists in the proscribed territory concerning the establishment of an optometrically-owned Excimer Laser center (an ocular care device) in violation of the covenant." Record at 413. R. Norlund's covenant forbade him from contacting referring optometrists, either directly or indirectly, with regard to former, current or potential patients. R. Norlund mailed a letter to the optometrists on the day he left Faust Eye Center. The letter in question is directed toward optometrists. The letter is also patient-oriented and is geared to prospective referrals of patients which have the same sort of problems with which Faust deals. It was certainly within the province of the trial court to conclude that this letter was a violation of the covenant not to compete.

We agree that these findings and conclusions reflect irreparable injury to Faust. *See Peters v. Davidson, Inc.* (1977) 172 Ind.App. 39, 359 N.E.2d 556, 560.

### III.

### THE EMPLOYMENT AGREEMENT

#### (A) *I.C. 25–1–9–5 Does Not Invalidate the Agreement*

This court must determine whether I.C. 25–1–9–5 (Burns Code Ed.1996), which sub-jects optometrists to disciplinary sanctions for accepting employment to practice optometry from anyone other than another optometrist or a corporation formed by an optometrist, renders the entire contract between R. Norlund and Faust illegal and therefore void. Although this court is of the view that the contract entered into is in contravention of the statute, R. Norlund may not be heard to avail himself of this defense in the light of the fact that he entered into the contract with full knowledge of the statute in question.

 R. Norlund argues that I.C. 25–1–9–5 renders the contract between the parties unenforceable. The statute provides that an optometrist:

> "is subject to the exercise of disciplinary sanctions ... if, after a hearing, the board finds [that the optometrist] has accepted employment to practice optometry from a person other than:
>
> (1) A corporation formed by an optometrist under I.C. 23–1.5; or
>
> (2) An individual who is licensed as an optometrist under this article and whose legal residence is in Indiana." *Id.*

It is well-established that the language of statutes should be construed according to their plain, ordinary and usual meaning. *Marion County Sheriff's Merit Bd. v. Peoples Broadcasting, Corp.* (1989) Ind., 547 N.E.2d 235. It is clear that R. Norlund, an optometrist, accepted employment, in part to practice optometry, from Faust, an ophthalmologist. The employment contract was therefore in violation of the statute.[3]

 Generally, the law declares that a contract made in contravention of a statute is void. *Maddox v. Yocum* (1941) 109 Ind.App. 416, 31 N.E.2d 652. However, our courts have recognized the principle that a contract will not automatically be held void merely because it violates a statute. *See Continen-*

---

**3.** Faust misleadingly argues that the statute allows an optometrist to be employed by a corporation pursuant to I.C. 23–15. However, Faust omits the fact that the corporation must be formed by an optometrist to satisfy the statute.

Alternatively, Faust argues that I.C. 25–24–1–5 which says that nothing in the *chapter* is applicable to physicians, etc., applies to the entirety of *Title* 25, not simply *chapter* 25–24–1. Appellees' interpretation is inappropriate and is rejected.

*tal Basketball Ass'n., Inc. v. Ellenstein En-terprises, Inc.* (1996) Ind., 669 N.E.2d 134; *Noble v. Alis* (1985) Ind.App., 474 N.E.2d 109, *trans. denied.* The court may consider other factors such as the subject matter of the contract, the strength of the public policy underlying the statute, the likelihood that the court's decision in voiding the contract will actually further that public policy, and the detriment that the court's action would have upon the party seeking to enforce the bargain. *Id.* at 111. It is equally important the court consider the relative benefit which the party seeking to avoid the bargain has enjoyed.

In *Noble, supra,* 474 N.E.2d at 109, the court invalidated a lease agreement because the dwelling in question was in violation of certain housing laws. Therefore, the lease was held voidable as opposed to void. The court noted that the underlying statute was enacted to advance the public health, safety and welfare. The court pointed out that such an underlying factor weighs heavily toward denying enforcement of the contract. *Id.*

The court went on further to note that the lessees in the case never "moved into the apartment and thus *never benefitted in any way from the ... agreement." Id.* at 112. (emphasis supplied). The opposite holds true here. R. Norlund did benefit from the agreement, and in fact, has benefitted fully therefrom. By voiding the contract, the only effect will be to cost Faust part of his agreed-upon bargain.

 Faust asks this court to recognize the principles of equity which forbid a party from accepting the benefits of a contract and then disavowing its validity. As enunciated in *Raymundo v. Hammond Clinic Assoc.* (1983) Ind., 449 N.E.2d 276, 283, "[a] party may not claim benefits under a transaction or instrument and, at the same time, repudiate its obligations." *Id.* Norlund was fully aware that the contract into which he entered was in violation of the statute. He acquiesced to that violation and may not now claim that the very same violation relieves him of his obligations. This court agrees with the trial court's conclusion of law # 2 that the contract is not void as a matter of law.

**(B)** *The Assignment of the Agreement From Faust to Faust, P.C.*

 Norlund also argues that the employment contract between himself and Faust cannot be enforced by Faust Eye Center, P.C. because Faust, P.C. was never a party to the contract. The employment contract between Faust and Norlund is one for personal services as evidenced by the contract itself. Indiana courts have recognized that, as a general rule, personal services contracts are not assignable by the employer. *See, Jones v. Servel* (1962) 135 Ind.App. 171, 180, 186 N.E.2d 689, 693; *First Community Bank and Trust v. Kelley, Hardesty, Smith and Co., Inc.* (1996) Ind.App., 663 N.E.2d 218, 223 (noting that claims arising out of personal service contracts are generally not assignable). However, some courts have observed that the employee may acquiesce in and consent to the assignment of the contract. *Johnston v. Dockside Fueling of N.Am.* (1995) Fla., 658 So.2d 618, 619, *reh'g denied; Spengler v. Pitluk* (1953) Tex.Civ. App., 261 S.W.2d 470, 471; *cf. Parker v. Camp* (1995) Ind.App., 656 N.E.2d 882, 884 n. 2 (nonassignability clause in contract deemed waived by party which accepted payments from assignee and discussed balloon payment with assignee through agent).

This court must address the effect of Faust's incorporation as Faust Eye Center, P.C. with respect to Norlund's employment contract. Norlund points out that Faust never made a formal assignment of the employment contract to the corporation. Appellants Br. at 46. However, it is clear that Faust Eye Center, P.C. became obligated to pay R. Norlund's salary under the contract. Appellee points to *Peters v. Davidson, Inc., supra* 359 N.E.2d at 556 for the conclusion that Faust Eye Center, P.C. succeeded to the rights of Faust Eye Center after incorporation. Although *Peters* held that the corporation in question, after merger, succeeded to all of the rights, liabilities and obligations of the merging corporation, the case is distinguishable. In *Peters,* the contract between Peters and Avels (the merging corporation) specifically provided that it was assignable. Additionally, I.C. 23–1–5–5, *repealed by* Acts

1987, P.L.149–1986, § 65, provided that a surviving corporation succeeded to the rights of the merging corporation. *Id.* at 562. The contract here does not include language permitting assignability and the statute in question in *Peters* is no longer in effect. Accordingly, the holding in *Peters* is not persuasive.

Although *Peters'* holding is distinguishable from the present case, the court addressed a relevant point when it said:

"We do not feel that an employee, who freely enters into an employment agreement containing an enforceable covenant not to compete, should be relieved of his contractual obligations simply because his employer's name changed following a valid merger whereby the rights to the employment agreement are transferred. This would seem to be especially true in those cases where, as here, the employee continues to accept the benefits of his agreement without objection to the merger." *Id.* at 562.

In *Ruberoid Co. v. Glassman Constr. Co.* (1967) 248 Md. 97, 234 A.2d 875, the Maryland Court of Appeals reversed the trial court's ruling that a nonassignment clause in a contract prevented an assignment between Miller Floor Company, a sole proprietorship, and Miller Floor Company, Inc., which was wholly owned and managed by Miller. The court, quoting Justice Traynor of the California Supreme Court, noted that " *'if an assignment results merely from a change in the legal form of ownership of a business, its validity depends upon whether it affects the interests of the parties protected by the non-assignability of the contract.'* " *Id.* 234 A.2d at 879 (quoting *Trubowitch v. Riverbank Canning Co.* (1947) 30 Cal.2d 335, 182 P.2d 182). The Maryland court noted that the nonassignability of the contract was to protect Glassman's interest in having the work in question performed by a competent subcontractor. That goal was not defeated by allowing the assignment to Miller Floor Company, Inc., which was in all material aspects identical to Miller Floor Company. *Id.*

Finally, in *Spengler, supra* 261 S.W.2d at 470, an employee claimed that his employer, a partnership, added another partner, thus constituting a change in the entity. As such, the employee argued that this constituted an invalid assignment of his employment contract; therefore, the employee contended, the restrictive covenant in the contract was not applicable after he left his employment. The court agreed that the employee's personal service contract was not assignable, *"without the consent* of the employee." *Id.* at 471 (emphasis in original). However, the court went on to add that the employee's continued employment, acceptance of salary and knowledge of the addition of the partner constituted his acquiescence in and agreeing to the new arrangement, i.e. the assignment of the contract. Appellants cite *Johnston, supra* 658 So.2d at 618 for the proposition that Faust's incorporation severed the contract between Faust and R. Norlund. In *Johnston,* the employer, Dockside Fueling Service, Inc. (Dockside) dissolved and three months later Dockside Fueling of North America, Inc. (Dockside, N.A.) was incorporated with all of Dockside's assets being transferred thereto. Johnston, the employee, signed an employment contract with Dockside containing a covenant not to compete. He continued to work for the two corporations throughout the entire time. The Florida Court of Appeals, in reversing the trial court, noted that Johnston's continued employment, "in and of itself was not sufficient to constitute consent to the assignment of his employment contract." *Id.* at 619.

In so far as the Florida court observed that continued employment alone will not constitute consent to the assignment of a personal services contract, we agree. The parties must have knowledge of the assignment in order to consent to it. Parties have the right to determine with whom they contract. *Spengler, supra* 261 S.W.2d at 471. If an employee can be said to consent to the assignment of his contract without knowledge of that assignment, it defeats the aforementioned right. If however, the employee is aware of the assignment and continues his employment knowingly, he may not thereafter successfully claim that he opposes said assignment. In the present case, there is evidence of record that R. Norlund had

knowledge of the assignment between Faust Eye Center and Faust Eye Center, P.C.[4]

■ We are thus brought to Justice Traynor's reasoning set forth above. This court perceives no reason why the contract between Faust, P.C. and R. Norlund should not be enforced. The contract did not contain a specific provision that it could not be assigned by Faust.[5] The only reason that the personal service contract was not assignable was based upon the principle that R. Norlund should be able to work for whomever he wished, i.e. Joseph Faust. That goal (of working for Faust) is not damaged by the assignment of the contract from Faust to Faust, P.C. Faust Eye Center and Faust Eye Center, P.C. are materially identical. R. Norlund has raised no concern which is relevant to Faust's incorporation. He appears to seek refuge in the mere technicality of Faust's incorporation to avoid the consequences of his covenant not to compete. This court holds that the assignment of R. Norlund's employment agreement from Faust to Faust, P.C. is valid.

### IV.

### THE COVENANT NOT TO COMPETE

Covenants not to compete are agreements in restraint of trade, and as such, they are not favored by Indiana courts and are to be narrowly construed. *See, e.g., Harvest Ins., supra* 492 N.E.2d at 686; *American Shippers Supply Co. v. Campbell* (1983) Ind.App., 456 N.E.2d 1040. If the restriction is reasonable as to the parties and the general public, it is enforceable and not void as against public policy. *Fumo, supra* 590 N.E.2d at 1103.

(A) *Covenants Not to Compete in Restraint of Medical Services*

■ Covenants not to compete which restrict medical services in a particular area are not void per se as against public policy. *Id.; Medical Specialists, Inc. v. Sleweon* (1995) Ind.App., 652 N.E.2d 517, *trans de-*

nied (citing *Raymundo, supra* 449 N.E.2d at 276). *Contra Gomez v. Chua Medical Corp.* (1987) Ind.App., 510 N.E.2d 191 (Sullivan, J., concurring), *reh'g denied.* It would seem that a covenant not to compete which, as a result of its enforcement, restricts medical service to an area is necessarily injurious to the public health. The writer of this opinion addressed this problem in *Gomez, supra* at 191 (Sullivan, J., concurring). That opinion, joined by Judge Garrard, addressed the concern that physicians were analogous to firefighters and police officers, and the belief that a contract may not deny such necessary services to society. *Id.* at 196. Unless the property interest to which the contract speaks "is more important than the public access to medical treatment, the noncompetition provision should be carefully scrutinized." *Id.*

However, our Supreme Court held in *Raymundo, supra,* 449 N.E.2d at 279, that:

"[w]ith respect to Dr. Raymundo's claim that the covenant is inimical to the public interest and unenforceable as a matter of public policy, he has not supported his claim with any cogent argument or authority as to why a physician's agreement not to compete should be treated differently, as a matter of public policy, than that of other business or professional people. His comments that it is in the public interest for physicians, as a group, to determine their code of conduct and ethical standards, that enforcement of such covenants may inflict a hardship upon the covenantor and that the public may thereby be denied medical services are unpersuasive in the light of the public interest in the freedom of individuals to contract." *Id.*

■ Since our Supreme Court has found it unnecessary to revisit the principle enunciated in *Raymundo,* namely that the public's general interest in medical services is subservient to the public interest in the freedom of individuals to contract, and despite reservations to the contrary, this court holds that a

---

4. In fact, Appellants point out that the testimony is "undisputed that after the formation of Faust, P.C., R. Norlund ceased working for Faust and began working for Faust, P.C." Appellants Br. at 47.

5. There was, however, a specific provision that disallowed assignment of the contract by R. Norlund. Record at 588.

covenant not to compete as a part of a contract for medical services is not invalid as a matter of law.

The decision in this case is made easier, however, by noting that R. Norlund is not restrained from providing medical services.[6] He is restrained from contacting and discussing patients with the referring optometrists. What R. Norlund has been doing, and what he is restrained from, is acting as a salesman of sorts. Before and after the injunction, Faust was the one performing the surgeries in question.

The findings of the trial court refer to a "void in the market"; however, that is not tantamount to saying that the result of the covenant not to compete was injurious to the public. There are often voids in the market which do not necessarily injure the public. Furthermore, the "void" referred to here is for a person performing services as an optometric liaison, not a person performing medical services. This court cannot say that the trial court erred in concluding that this contract did not disserve the public interest. Therefore, the decision of the trial court that the covenant not to compete is not against the public interest is affirmed.

### (B) *Faust's Protectable Interest*

▆▆▆ The quintessence of the case before this court is the validity of the terms of the covenant not to compete. This court must look to whether the terms of the covenant "were reasonable with respect to (1) the necessity of the breadth of the protection for the covenantee [Faust]; (2) the restriction upon the covenantor [R. Norlund]; and (3) the public interest." *Harvest, supra,* 478 N.E.2d at 104. In determining the reasonableness, factors to be considered are the scope of the legitimate business interests of the employer and the geographic and temporal limits on the restraint. *See Id.; Licocci v. Cardinal Associates, Inc.* (1983) Ind., 445 N.E.2d 556; *Miller v. Frankfort Bottle Gas, Inc.* (1964) 136 Ind.App. 456, 202 N.E.2d 395.

▆▆▆ As earlier noted, covenants not to compete are in restraint of trade and gener-

ally disfavored *See Harvest, supra,* 492 N.E.2d at 686. An employer may not simply forbid his employee from subsequently operating a similar business. The employer must have an interest which he is trying to legitimately protect. There must be some reason why it would be unfair to allow the employee to compete with the former employer. The employee should only be enjoined if he has gained some advantage at the employer's expense which would not be available to the general public.

▆▆▆ Consequently, courts have held covenants not to compete valid when they protect an employer's interest in trade secrets, *Jenkins v. King* (1946) 224 Ind. 164, 65 N.E.2d 121, or other confidential information. Conversely, Indiana courts have held that a covenant not to compete which protects an employer's customer list readily available to the public and not regarded as confidential, *American Shippers, supra,* 456 N.E.2d at 1040, or general practice that could be observed by anyone, *cf. Slisz v. Munzenreider Corp.* (1980) Ind.App., 411 N.E.2d 700 (former employee's use of similar advertising techniques and selling similar products), is not valid. In Indiana, the law recognizes a protectable interest in the good will generated between a customer and a business. *Licocci, supra,* 445 N.E.2d at 556; *Miller, supra,* 202 N.E.2d at 395; *See also Field v. Alexander & Alexander of Indiana, Inc.* (1987) Ind.App., 503 N.E.2d 627, *trans. denied.* That good will may be protected with a covenant not to compete.

If an employee is hired in order to generate such good will, he may be enjoined from subsequently contacting those customers or using that good will to his advantage. *See Miller, supra,* 202 N.E.2d at 395. In *Miller* and in other "salesman route cases", *Licocci, supra,* 445 N.E.2d at 564, Indiana courts have decided that a salesman may be restrained from contacting his former customers within his previous sales area. There is a personal nature to the relationship between the salesperson and customer, and many times, the customers' (in this case the refer-

---

**6.** As noted below, the portion of the covenant not to compete which restrains R. Norlund from performing services as a medical optometrist within the specified region is void as a matter of law.

ring optometrists') only contact with the company is through the salesperson. Although R. Norlund was not a "salesman" per se, we reason to apply those cases by analogy.

■ R. Norlund was employed by Faust to generate good will between Faust and the area optometrists. Although Faust does not have a protectable interest in the patients of those optometrists, Faust does have an interest in the good will created by R. Norlund on Faust's behalf. Therefore, that interest is protectable and the action of the trial court enjoining R. Norlund from contacting any of the optometrists as outlined in the court's order sections 3 and 4 is valid.

■ The trial court also upheld the portion of the covenant which prevented R. Norlund from acting as an optometric liaison or medical optometrist for or in association with any ophthalmologist within the specified counties. All that portion of the covenant does is prevent R. Norlund from practicing his livelihood. So long as R. Norlund is not contacting any of the optometrists previously mentioned, Faust has no protectable interest. If there is no protectable interest involved, an employer may not forbid an employee to subsequently work in his profession in such a large area. Without contacting the optometrists listed, R. Norlund has no advantage which any other optometrist would not have starting a business in the area. Consequently, section 4 of the trial court's injunction is hereby held invalid.[7]

7. It is interesting to note, however, that R. Norlund himself has pointed out that if he does provide services while employed as an optometrist by an ophthalmologist, he may be in violation of I.C. 25-1-9-5.

8. Because this court disposed of section 4 of the trial court's order, we need not deal with whether the geographic restriction, which covered counties from which Faust had never received a referral, was overbroad as a matter of law.

9. The trial court concludes that Ind.Trial Rule 65(D) empowers it to enter a binding injunction against a party "in active concert or participation" with the defendant in the case. Record at 414. However, T.R. 65(D) declares that an injunction entered in an action is "binding only upon the parties to the action, their officers,

(C) *The Geographic and Time Restraints of the Restrictive Covenant*

■ If the employer has a protectable interest, that employer may restrict an employee from competing, after the period of employment, in an area that is not unreasonably broad and for an amount of time that is also not unreasonable. Here the trial court concluded that two years was not an unreasonable length of time. The trial court found that sections i and ii of Norlund's covenant extended to the 122 practicing optometrists listed on defendant's exhibit I. These were optometrists who had referred patients to Faust during the time of R. Norlund's employ. The use of territorial boundaries is only one method of limiting a covenant's scope, and when a covenant not to compete contains a restraint which clearly defines a class of persons with whom contact is prohibited, the need for a geographical restraint is decreased. *Field, supra*, 503 N.E.2d at 627; *Seach v. Richards, Dieterle & Co.* (1982) Ind.App., 439 N.E.2d 208, 213. Consequently, this court agrees with the trial court that those restrictions are not unreasonable.[8]

## V.

### ENJOINING PERSONS NOT PARTIES TO THE COVENANT

The most challenging question before this court is whether or not D. Norlund and ICL may be appropriately enjoined from the activities contained in R. Norlund's covenant not to compete. We hold that D. Norlund and ICL may so be enjoined.[9]

agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them." T.R. 65(D). The rule does not dictate against whom an injunction may be made, it dictates upon whom an injunction is binding. The question in this case is not whether an injunction made against R. Norlund may be enforced against D. Norlund; it is whether or not D. Norlund herself may be enjoined. T.R. 65(D) deals with enforcement. *See Kasco Services Corp. v. Benson* (1992) Utah, 831 P.2d 86, 90; *Las Vegas Novelty, Inc. v. Fernandez* (1990) Nev., 106 Nev. 113, 787 P.2d 772, 774. The two aforementioned cases do, however, note that T.R. 65(D) provides support for the view that a preliminary injunction may be made against one who is not a party to a contract. *Id.*

Indiana case law provides little guidance on this question, but Faust directs our attention to *McCart v. H & R Block, Inc.* (1984) Ind.App., 470 N.E.2d 756, *trans. denied.* In that case, the appellants, Robert and June McCart, had been enjoined by the trial court "... from participating in any business, either directly or indirectly, or by acting individually, to file, prepare, or assist in preparing income tax returns within fifty (50) miles of the city of Rochester, Indiana." *Id.* at 758. The injunction was made pursuant to a covenant not to compete signed by June only. *Id.*

Subsequent to her disassociation with H & R Block, June wrote a letter to former H & R Block clients informing them that she would no longer be with the company and expressing her dissatisfaction with Block's "unwarranted" price increases. In her letter, she also mentioned that she would be helping out her husband in his tax service. In the same envelope (which happened to be H & R Block stationery with the H & R Block name blacked out), Robert included a letter that declared he was starting a new tax service and would provide that service at 10% off the price the customers had paid the previous year. *Id.* at 759.

In addition to the above, Robert told the post office that all mail addressed to their new office at 900 Main Street should be delivered there, even if addressed to Block. Finally, when the new Block franchisee called information for Block's number, she was asked if she wanted the 802 Main Street (the location of the new Block office) or 900 Main Street number. *Id.*

The trial court decided that the McCarts had acted together to breach the agreement that June had signed with H & R Block. The trial court entered an injunction against Robert and June, albeit that Robert had never signed the agreement with H & R Block.

Judge Garrard, speaking for this Court, looked to the law of other states in deciding the issue. The court concluded "'... that the rule that a stranger to a covenant may be enjoined from aiding and assisting a covenantor in violating his covenant is supported by an overwhelming weight of authority.'" *Id.*

at 760 (quoting *West Shore Restaurant Corp. v. Turk* (1958) Fla., 101 So.2d 123 (citations omitted)). And, it was not "necessary to show Robert's signature on the agreement before enjoining him from assisting the breach of the agreement by June. The evidence supports the finding that Robert acted together with June to breach her agreement with Block." *Id.* at 762.

The court in *McCart* agreed with the trial court's reasoning that to allow Robert to continue in the tax preparation business without any of the restrictions of the covenant not to compete would frustrate the purpose of the agreement between Block and June. The court would not allow a "mere subterfuge designed to avoid June's obligation" to circumnavigate justice. *Id.*

*McCart* cites heavily to *Arwell Div. of Orkin Exterminating Co. v. Kendrick* (1971) 131 Ill.App.2d 632, 267 N.E.2d 352. In *Kendrick*, the husband, John Kendrick, worked for Orkin and signed a covenant not to compete which provided that he would not compete directly or indirectly with the business of the plaintiff within an area of 20 miles of where John had worked for the plaintiff. Subsequent to his resignation with Orkin, plaintiff asserted that John opened up a competing business in LaSalle, Illinois, which was admittedly within the proscribed area. John asserted that the business was the sole interest of his wife Marguerite Kendrick. The only issue on appeal was whether the covenant not to compete could be enforced against Marguerite.

The court concluded that the covenant could be enforced against Marguerite. The court pointed out that "[a] party that induces another to violate his contract may be restrained from such conduct." It also concluded that "[i]f a party knowingly participates or aides another in the violation of the contract[,] such conduct may be regarded as inducement." *Id.* 267 N.E.2d at 354. In examining Marguerite's claim that the business was solely hers, the court noted that there was substantial evidence from which one could infer that she was acting in concert with John to avoid the contract. The court looked at the fact that John had assisted in

funding the business and that he had helped with items such as picking out a building, and a truck, and "was otherwise involved in the business". *Id.* The court concluded that Marguerite's ownership of the business was a matter of form, not of substance, and that she could be enjoined. *Id.*

The *McCart* court also directs the reader to *Sulmonetti v. Hayes* (1964) 347 Mass. 390, 198 N.E.2d 297. *Sulmonetti* involved a covenant not to compete ancillary to the sale of a business rather than to an employment contract. It considered an injunction against a wife who was not a party to her husband's covenant not to compete. The husband, Frank Hayes (Frank) signed the covenant when he sold his retail oil business, use of the name Hayes, and the business' good will to Sulmonetti (the buyer). The buyer also payed Frank $80 for certain use of the Hayes premises and facilities. Frank subsequently went to work for the buyer. Sometime thereafter, Frank and his wife, Emily Hayes (Emily), consulted a lawyer and decided to resume selling oil at their residence. Emily began the business of selling fuel oil, incorporating as Grafton Oil, of which she was the sole shareholder. Emily actively solicited customers of the buyer, hired employees away from the buyer, and Frank's mother sent notice to the buyer to vacate the premises. *Id.* 198 N.E.2d at 299–300.

During this time, "Frank remained in the employ of the buyer, and played an apparently passive role in organizing Grafton Oil and in soliciting the buyer's customers." *Id.* at 300. There was also evidence that Frank did not play a satisfactory role in winning back customers for the buyer or adequately performing his duties as an employee of the buyer. It seemed that the buyer's deliveries to customers, under Frank's command, were tardy while Emily's deliveries from Grafton Oil were on time. *Id.*

*Sulmonetti* concluded that Emily had "deliberately and wilfully connived with her husband, and purposely acted both with him and independently of him, to appropriate to herself and her husband the good will that the buyer had purchased from Frank." *Id.* 198 N.E.2d at 301. The court recognized that a seller cannot compete with a buyer in a way that deprives the seller of the good will that he has purchased. This principle is underlined by the concept of fair dealing. The court felt that Emily's actions "total[ly] disregard[ed] that concept [of fair dealing] and reache[d] a form of unfair competition which calls for injunctive relief." *Id.*

■ Although a person may be subject to an injunction with regard to a covenant to which she is not a party, there must be evidence that she aided or operated in concert with the covenantor to breach the covenant or that she was the alter ego of the covenantor. In *Russell v. Mullis* (1985) Ala., 479 So.2d 727, Jack Mullis sold his two convenience stores to William Russell and signed a covenant not to compete for ten years within ten miles of the convenience stores. Jonnie Mullis, Jack's wife, owned the real estate upon which the businesses were located jointly with Jack (although the businesses themselves were solely Jack's). As such, Jonnie received a portion of the proceeds. Subsequently, the couple purchased real estate within eight miles of the aforementioned convenience stores.

Jonnie used part of her money to erect a building on the land, which became "Dixieland" convenience store. Jack did oversee the construction of the building, but that was "ostensibly to make certain that the construction did not adversely affect" that portion of the land upon which he intended to build a recreational vehicle park. *Id.* Dixieland was owned and operated solely by Jonnie. She obtained additional financing without a co-signer, she negotiated with suppliers, and licenses were issued in her name. In fact, Jack did not purchase products, assist Jonnie with inventory or marketing, or help her in any way.

The court in *Russell,* citing 94 A.L.R. 345 (1935), noted that a stranger to a covenant may be restrained from aiding a covenantor in violating the covenant. However, unlike the cases above, the trial court found that there was no evidence that Jonnie acted as a front for Jack. *Id.* Merely the fact that the parties were married will not make them alter egos of one another, and the wife in the above case was free to start a business independently of her husband, even if it was in

the same area from which the husband was prevented from competing.

■ *McCart* and the primordial pool of jurisprudence from which it sprang, leads this court to conclude that the trial court's decision that R. Norlund's covenant not to compete should be extended to enjoin D. Norlund and ICL from those activities which assist R. Norlund in breaching the covenant is not in error. It is a fundamental principle in Indiana that "[t]he law will not permit him to do indirectly, or through [others], what he could not do directly, by himself." *Eisel v. Hayes* (1895) 141 Ind. 41, 40 N.E. 119, 119. The trial court did not abuse its discretion in concluding that R. Norlund was attempting to circumnavigate this principle through his wife and ICL.[10]

Appellants argue an affirmance by this court will prevent employers from hiring anyone who is subject to a covenant to not compete. That is not the case. This decision is limited to the facts before the court. There was evidence that the covenantor had a hand in establishing the business and furthering its initial efforts. From this, the trial court could deduce that this was, in part, R. Norlund's business. This decision should also not be interpreted to indicate that a spouse cannot conduct an independent business. In fact, the *Russell* case clearly shows that if there is no evidence that the covenantor is acting with or through the spouse then no injunction shall be issued. If D. Norlund was already engaged in a secondary care optometric business before R. Norlund's covenant not to compete came into play, then that business would genuinely be hers. However, here the coincidences follow one on top of another. D. Norlund started the business shortly after R. Norlund left Faust; R. Norlund threatened to take business from Faust; R. Norlund loaned money to D. Norlund; R. Norlund contacted McGarvey; R. Norlund wrote a letter to all the optometrists in northeastern Indiana; R. Norlund performed services for ICL (albeit without compensation). It was certainly within the trial court's fact-finding discretion to deduce that

D. Norlund and R. Norlund were acting in concert.

The trial court found that the Appellees had made a prima facie showing that the covenant had been indirectly breached by R. Norlund in concert with D. Norlund and ICL. The cases above clearly stand for the proposition that a third party may be enjoined from those acts which would constitute a breach of the covenant not to compete if it can be shown that the third party is acting in concert with the covenantor or acting to assist the covenantor in breaching the agreement. Although the actions of the covenantors in the cases above cited which sustained injunctions were far more blatant and oftentimes more egregious than those of R. Norlund, this court cannot say that the trial court's conclusion that the parties were acting in concert was in error. It is not this court's place to decide whether or not Faust will ultimately prevail on the claim that D. Norlund and ICL were acting in concert with R. Norlund to breach the covenant. Due to the fact that this is an appeal from the granting of a preliminary injunction, the conclusion of the trial court that there is a likelihood of success on the merits must stand unless it is so improbable as to render the trial court's determination erroneous as a matter of law. Therefore, the decision of the trial court preliminarily enjoining D. Norlund and ICL from those actions which would constitute a violation of R. Norlund's covenant not to compete is affirmed.

## VI.

## CONCLUSION

The trial court's December 8, 1995 order enjoined R. Norlund, D. Norlund and ICL from:

"contacting, directly or indirectly, any of the 122 referring optometrists listed on Defendants' Exhibit I admitted into evidence with regard to former, current or potential patients of said referring optometrists[;]

---

**10.** Jay McGarvey is not a party to this appeal. Therefore we make no decision whether McGarvey could also be enjoined from those acts which would breach the covenant not to compete if the trial court found that he was acting in concert with R. Norlund.

. . . discussing with any of the 122 referring optometrists listed on Defendants' Exhibit I admitted into evidence (whether the discussion is initiated by them or by a referring optometrist) any former, current or potential patients of the referring optometrists[; or]

. . . performing any services as an optometric liaison or medical optometrist, as those terms are defined in the Employment Agreement admitted into evidence in this case as Defendants' Exhibit B for, or in association in any way with, any ophthalmologists in the counties specified on Exhibit A to the Employment Agreement admitted into evidence as Defendants' Exhibit B."

Record at 417–18.

As this is an appeal from the grant of a preliminary injunction, this court may only reverse the decision of the trial court if we cannot say that the trial could reasonably have concluded that Faust made a prima facie showing before that court. We may not reweigh the evidence, and may not, independently, decide whether or not Faust, in fact, showed a likelihood of success upon the merits. As such, we must affirm the decision of the trial court with regard to the first two paragraphs of the injunction above.[11]

As to the third paragraph, above, we must disagree with the trial court. Faust has no protectable interest outside of the relationship that he has nurtured with the referring ophthalmologists through R. Norlund. What Faust is trying to protect is the novelty of the way in which he develops patient referrals. As this is not a trade secret and any observer would be able to mimic Faust's business practice, he may not prohibit R. Norlund, D. Norlund or ICL from performing services as an optometric liaison or as a medical optometrist within the listed counties. The order of the trial court enjoining R. Norlund, D. Norlund and ICL from performing such services is hereby reversed and vacated.[12]

KIRSCH, J., concurs.

11. Paragraphs two (2) and three (3) of the trial court's December 8, 1995 order.

FRIEDLANDER, J., concurs in part and dissents in part with separate opinion.

FRIEDLANDER, Judge, concurring and dissenting.

I fully concur with the majority except with regard to Issue V. In my view, the trial court erred in enjoining Denise Norlund and Indiana Cataract and Laser.

The majority concludes that *McCart v. H & R Block, Inc.,* 470 N.E.2d 756 (Ind.Ct.App. 1984), *trans. denied,* and the line of cases from which it sprang dictate the conclusion that D. Norlund and ICL must be enjoined from conducting business because such constitutes assisting R. Norlund in breaching the covenant not to compete. In my view, however, the facts of the instant case are sufficiently distinct from those in *McCart* and the cases cited therein so as to render that line of cases inapplicable.

To summarize, *McCart, Arwell Div. of Orkin Exterminating Co. v. Kendrick,* 131 Ill. App.2d 632, 267 N.E.2d 352 (1971), and *Sulmonetti v. Hayes,* 347 Mass. 390, 198 N.E.2d 297 (Mass.1964), stand for the proposition that a person who was not a party to a covenant not to compete may nevertheless be enjoined from activities pursuant to that covenant. In each of those cases, the court held that the nonparty could be enjoined because, in essence, the nonparty's purported exclusive ownership was a "mere subterfuge", *McCart,* 470 N.E.2d at 762 (*see also Kendrick,* 267 N.E.2d 352 (nonparty's ownership was a matter of form, not substance)), and that the nonparty deliberately and wilfully acted in concert with the restricted party to violate the covenant not to compete. *See also Sulmonetti.*

In each of the above cases, the court examined the contributions of the party to the covenant in assessing whether the ownership of the nonparty was a mere subterfuge. However, those examinations also incorporated a comparison of the relative contributions of both the party and the nonparty. In *Russell v. Mullis,* 479 So.2d 727, also cited by the majority, the court concluded that the

12. Paragraph four (4) of the trial court's December 8, 1995 order.

nonparty spouse should not be enjoined, notwithstanding the fact that the spouse who was a party to the covenant participated to some extent in the business. The court concluded that the nonparty spouse was not "a front" for the other spouse. In so holding, the court noted the significant contributions of the nonparty spouse in initiating and maintaining the business.

In the instant case, D. Norlund is a licensed, practicing optometrist who desired to open her own practice. That desire was intensified when R. Norlund left Faust and thereby created a void in the market for secondary eye care. In starting ICL, D. Norlund drew upon an extensive network of personal contacts that she had developed while working for others as an optometrist. She spent considerable time during evenings and on weekends establishing ICL. She accepted a new position with reduced hours because it allowed her to spend more time establishing and developing ICL's business.

McGarvey was also a licensed optometrist who left a successful practice in Florida in order to join with D. Norlund in establishing ICL. McGarvey negotiated his agreement entirely with D. Norlund and invested a considerable sum of his own money in ICL. D. Norlund and McGarvey are the sole officers and shareholders of ICL, which also employs another optometrist, two ophthalmologists, an administrator, and two other employees. Leases for the ICL office and equipment were obtained exclusively through D. Norlund's personal credit and the personal guaranty of McGarvey. Finally, the ICL bank account is accessible only to D. Norlund and McGarvey.

On the other hand, R. Norlund possesses neither an ownership interest in nor control over ICL operations. He is neither an officer nor an employee of ICL. He has not rendered services as an optometrist for ICL nor has he received compensation from ICL.

To be sure, there is evidence supporting a conclusion that R. Norlund engaged in activities concerning ICL that were in violation of the covenant not to compete and therefore were the proper subject of injunctive relief. However, the mere fact that R. Norlund violated the covenant does not lead inevitably to the conclusion that D. Norlund and ICL are so tainted by that participation that they, too, must be enjoined. R. Norlund's activities cannot be considered in isolation when making that determination. Rather, R. Norlund's actions must be viewed in relation to the combined contributions of all parties, particularly those of D. Norlund. *See, e.g., Russell,* 479 So.2d 727 (1985).

After reviewing the relative contributions of the various parties, I cannot agree that D. Norlund was a "front" for R. Norlund, or that D. Norlund conspired with her husband to assist him in violating the covenant not to compete. D. Norlund's activities in establishing ICL and developing its business, along with the combined contributions of McGarvey and the other employees of ICL, were of sufficient character in relation to the contributions of R. Norlund, that the covenant not to compete should not be construed to apply to them. I would not extend the injunction's reach beyond the activities of R. Norlund.