GOLD MESSENGER, INC., a Colorado
Corporation, Plaintiff–Appellee,

v.

Jesse McGUAY d/b/a Shear Power
and Penny Saver, Defendant–
Appellant.

No. 96CA1619.

Colorado Court of Appeals,
Div. V.

April 17, 1997.

Campbell Bohn & Leffert, LLC, Michael G. Bohn, James X. Quinn, Denver, for Plaintiff–Appellee.

Kimberly R. Willoughby, Denver, for Defendant–Appellant.

Opinion by Judge DAVIDSON.

Defendant, Jesse McGuay, d/b/a Shear Power and Penny Saver, appeals from the trial court's order issuing a preliminary injunction enjoining him from publishing, distributing, or circulating any advertising publication in competition, directly or indirectly, with plaintiff, Gold Messenger, Inc. Defendant maintains that the covenant not to compete that supports the injunction is void under § 8–2–113(2), C.R.S. (1986 Repl.Vol. 3B) as an improper restraint on trade. He also contends that the covenant not to compete, even if valid, is unenforceable against him because he was not a signatory to the contract that contained it. We affirm, although on different grounds than those relied upon by the trial court.

The facts as found by the trial court are as follows.

In about 1990, Donald Kittelson began publishing an advertising circular known as Gold Messenger. In 1992, after developing a comprehensive system for setting up and operating an advertising circular business, plaintiff, the corporation created by Kittelson, began selling Gold Messenger franchises.

Defendant's roommate and life partner (franchisee) purchased a Gold Messenger franchise in June 1994 for the Thornton/Northglenn area. Defendant was present during the negotiations for the purchase of the franchise and signed a $1,000 deposit

check to secure the franchise. He did not, however, sign the franchise agreement itself.

As part of the franchise agreement, franchisee received plaintiff's Operations and Procedures Manual (manual) which details how to set up and operate a Gold Messenger franchise.

The franchise agreement contains a covenant not to compete which provides that, at the termination of the franchise, franchisee may not compete directly or indirectly with Gold Messenger for three years and within fifty miles of Gold Messenger franchise territories.

In January 1996, after franchisee failed to pay royalties required under the agreement, plaintiff terminated the franchise agreement.

At about the same time, defendant began publishing "Penny Power," a competing advertising circular, and distributed it in roughly the same territory as he and franchisee had distributed the Thornton/Northglenn Gold Messenger.

Plaintiff filed suit, claiming, among other things, that defendant and franchisee had breached the terms of the covenant not to compete and had misappropriated for their own use plaintiff's trade secrets. Plaintiff also sought injunctive relief. After determining that plaintiff would likely succeed on the merits of his breach of covenant claim and that injunctive relief was necessary, the trial court issued a temporary restraining order and, subsequently, a preliminary injunction against both franchisee and defendant.

Only defendant appeals from the issuance of the preliminary injunction.

## A.

■ The decision whether to grant preliminary injunctive relief is within the sound discretion of the trial court and will not be reversed absent an abuse of that discretion. *Rathke v. MacFarlane,* 648 P.2d 648 (Colo. 1982).

■ In exercising its discretion, the trial court must find that the party seeking the preliminary injunction has demonstrated: (1) a reasonable probability of success on the merits; (2) a danger of real, immediate, and irreparable injury that may be prevented by injunctive relief; (3) the absence of a plain, speedy, and adequate remedy at law; (4) that the granting of a preliminary injunction will not disserve the public interest; (5) that the balance of equities favors the injunction; and (6) that the injunction will preserve the status quo pending a trial on the merits. *See* C.R.C.P. 65; *Rathke v. MacFarlane, supra.*

Here, the trial court made specific findings that each of the six *Rathke* factors had been satisfied. On appeal, defendant contests only the court's determination that plaintiff has a reasonable probability of success on the merits of his claim for breach of the covenant not to compete.

Defendant's argument why plaintiff would not be successful on this claim is threefold: First, he contends that the covenant not to compete contained in the franchise agreement was void and unenforceable under the general rule precluding such agreements found in § 8-2-113(2) because the franchise agreement falls within neither the exception for the sale of a business nor the exception for the protection of trade secrets; secondly, defendant contends that the information at issue did not constitute trade secrets; third, defendant contends that, even if the covenant were valid, it was unenforceable against him because he was not a signatory to the franchise agreement that contains the covenant.

## B.

Section 8-2-113(2) provides, in pertinent part:

Any covenant not to compete which restricts the right of any person to receive compensation for performance of skilled or unskilled labor for any employer shall be void, but this subsection (2) shall not apply to . . .

(a) Any contract for the purchase and sale of a business or the assets of a business;

(b) Any contract for the protection of trade secrets. . . .

### 1.

The trial court determined that the franchise agreement was akin to the sale of a business and, therefore, the covenant was valid under § 8–2–113(2)(a), C.R.S. (1986 Repl.Vol. 3B). This conclusion is questionable.

■ Although the sale of an existing franchise by a franchisee to a third party may constitute a sale of a business under § 8–2–113(2)(a), *see DBA Enterprises, Inc. v. Findlay,* 923 P.2d 298 (Colo.App.1996), Colorado appellate courts have not addressed the question whether the *creation* of a franchise arrangement constitutes the sale of a business. As it is, other jurisdictions are decidedly split in their conclusions on this matter. In addition, the reasoning and results of other jurisdictions' treatment of this issue vary widely because each jurisdiction must consider its respective statutory scheme and public policy. *See generally* Annot., *Validity and Construction of Restrictive Covenant Not to Compete Ancillary to Franchise Agreement,* 50 A.L.R.3d 746 (1973).

■ Besides there being no definitive authority in support of the trial court ruling, we note that, as set forth in § 8–2–113(2), covenants not to compete are disfavored in Colorado, and the exceptions to the general rule are narrowly construed. *See Colorado Accounting Machines, Inc. v. Mergenthaler,* 44 Colo.App. 155, 609 P.2d 1125 (Colo.App. 1980). Nevertheless, even if we assume that defendant is correct that the creation of a franchise arrangement does not constitute the sale of a business under § 8–2–113(2)(a), we determine that the franchise agreement here was a contract for the protection of trade secrets and, therefore, the covenant was valid under § 8–2–113(2)(b), C.R.S. (1986 Repl.Vol. 3B). *See Klipfel v. Neill,* 30 Colo. App. 428, 494 P.2d 115 (1972) (if trial court findings support its result under a different theory, appellate court may affirm judgment even though it rejects trial court reasoning).

### 2.

■ For a covenant not to compete to fit within the trade secret exception to § 8–2–113(2), the purpose of the covenant must be the protection of trade secrets, and the covenant must be reasonably limited in scope to the protection of those trade secrets. *See Management Recruiters of Boulder, Inc. v. Miller,* 762 P.2d 763 (Colo.App.1988).

Here, it is evident from the preamble to the franchise agreement that the agreement was entered into with the express purpose of protecting trade secrets. In pertinent part, it provides:

> WHEREAS, Franchisor is the owner of certain techniques, know-how, trade secrets and procedures (the Know–How) which are used in connection with Franchisor's Controlled Circulation Advertising Publication business and Franchisor's Franchisees; and

> WHEREAS, Franchisor [has] developed a unique system for operating [the] business, including business forms, bookkeeping and accounting materials and techniques, management and control systems, and, in general, a style, system, technique and method of business operation . . .

> WHEREAS, Franchisee recognizes that it does not currently have the expertise contained in the developments as stated above and desires to use those developments pursuant to a franchise agreement . . .

> WHEREAS, [Franchisee] has a full and adequate opportunity to be thoroughly advised of the terms and conditions of this Franchise Agreement by counsel of its own choosing; and

> WHEREAS, the parties wish to enter in the following terms and conditions of this Franchise Agreement.

The covenant not to compete provides that the franchisee will not engage, in any fashion:

> in any other business which offers or sells any product or service (or component thereof) which comprises or may in the future comprise a part of Franchisor's franchise system or which competes directly or indirectly with Franchisor's system, if such other business is located in or within fifty (50) miles of Franchisee's Territory, or in or within fifty (50) miles of any other Territory which is part of Franchisor's franchise system. . . .

Read in conjunction with the preamble to the franchise agreement, the covenant not to compete precludes franchisee from using the confidential information contained in the manual to compete unfairly against franchisor or other franchisees. Thus, by both its purpose and its scope, the covenant is, in essence, for the protection of trade secrets. *See Management Recruiters of Boulder, Inc. v. Miller, supra.*

## C.

Defendant contends, however, that, even if the agreement protects trade secrets and thus is not void as a matter of law, plaintiff does not have a reasonable probability of success on the merits of his breach of covenant claim because the manual did not actually contain trade secrets. Based on the trial court's findings, we disagree.

Under the Colorado Uniform Trade Secrets Act, a trade secret is defined in § 7–74–102(4), C.R.S. (1986 Repl.Vol. 3A) as:

the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, improvement, confidential business or financial information, listing of names, addresses, or telephone numbers, or other information relating to any business or profession which is secret and of value. To be a 'trade secret' the owner thereof must have taken measures to prevent the secret from becoming available to persons other than those selected by the owner to have access thereto for limited purposes.

*See also Porter Industries, Inc., v. Higgins,* 680 P.2d 1339 (Colo.App.1984), (factors to consider in recognizing a trade secret include (1) the extent to which the information is known outside the business, (2) the extent to which it is known to those inside the business, *i.e.,* by the employees, (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information, (4) the savings effected and the value to the holder in having the information as against competitors, (5) the amount of effort or money expended in obtaining and developing the information, and (6) the amount of time and expense it would take for others to acquire and duplicate the information).

In short, a trade secret "may consist of any formula, pattern, device, or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." *Management Recruiters of Boulder, Inc. v. Miller, supra,* 762 P.2d at 765.

What constitutes a trade secret is a question of fact for the trial court. *Network Telecommunications, Inc. v. Boor–Crepeau,* 790 P.2d 901 (Colo.App.1990). Findings of fact made by the trial court are binding on review if supported by evidence in the record. *Littlehorn v. Stratford,* 653 P.2d 1139 (Colo.1982).

Here, the trial court found that "the evidence in this case has provided, thus far, that Gold Messenger has taken substantial steps to protect the confidential nature of the confidential Operations and Procedures manual, as well as to [protect] other information provided to its franchisees." As the trial court noted, the manual was copyrighted by plaintiff and the agreement expressly notes that the information, knowledge, and "know-how" contained in the manual are deemed confidential.

The court further found that, although the precise value of the manual was in dispute, the information in the manual did have some value: The manual "did provide an advantage over other competitors." Additionally, while in possession of plaintiff's confidential information, defendant successfully produced several issues of Penny Power, a publication which the trial court noted was "quite similar" to Gold Messenger. Defendant was also paid $7,000 to assist in the startup of Shear Power, another advertising circular. As part of that arrangement, the owner of Shear Power was allowed to model his publication after Penny Power.

Moreover, as the trial court noted, the terms of the agreement declare that the confidential information constitutes the "trade secrets" of Gold Messenger and that the confidentiality of this information will not be subject to contest. *See Kodekey Electronics, Inc. v. Mechanex Corp.,* 486 F.2d 449 (10th

Cir.1973) (applying Colorado law, court found agreement by defendants not to disclose information obtained, not to compete, and not to use information obtained detrimentally was an acknowledgement of fact that the information was a trade secret).

### D.

Finally, defendant argues, even if the covenant were valid, a contract can be enforced only against a party to that contract. Accordingly, he asserts, because he did not sign the franchise agreement, the covenant not to compete is unenforceable against him. We disagree.

■ Defendant's contention notwithstanding, a non-signatory may be bound by a covenant not to compete based on his or her particular relationship to a business, *see Wolfe v. Jensvold,* 539 P.2d 1299 (Colo.App. 1975) (not selected for official publication) (a covenant not to compete may bind joint venturers) or, as pertinent here, when he or she assists a signatory to violate the covenant. *See generally* Annot., *Enforceability of Sale-of–Business Agreement Not to Compete Against Nonsigner or Nonowning Signer,* 60 A.L.R.4th 294 (1988).

A non-signatory to a covenant will be bound because a covenantor will not be allowed to do through others what he or she could not do directly. *See Day Cos. v. Patat,* 440 F.2d 1343 (5th Cir.1971), *cert. denied,* 404 U.S. 830, 92 S.Ct. 71, 30 L.Ed.2d 59 (a preliminary injunction that restrains both the covenantor and a third party is proper when the third party conspires with a covenantor to violate a covenant not to compete); *Dad's Properties, Inc. v. Lucas,* 545 So.2d 926 (Fla. Dist.Ct.App.1989) (even though wife was the sole owner of competing business, she was properly enjoined from competing because she was aiding and abetting her husband to violate his covenant); *Arwell Division of Orkin Exterminating Co. v. Kendrick,* 131 Ill. App.2d 632, 267 N.E.2d 352 (1971) (when there is substantial evidence that a non-signatory to a covenant not to compete is acting in concert with a signatory in order to evade the duty imposed upon the signatory by the covenant, nonsignatory may be enjoined from participating in the competing enterprise);

*Le Maine v. Seals,* 47 Wash.2d 259, 287 P.2d 305 (1955) (an injunction is proper when the newly formed competing business is the alter ego of the business previously run by covenantor).

■ And, under this doctrine, a third party is bound by the covenant at least to the extent that he or she assists the covenantor to violate the covenant not to compete. *See McCart v. H & R Block, Inc.,* 470 N.E.2d 756 (Ind.App.1984); *Madison v. La Sene,* 44 Wash.2d 546, 268 P.2d 1006 (1954).

■ Here, with record support, the trial court found that defendant and franchisee together operated their Gold Messenger franchise for at least two years. During that time, they were trained by plaintiff on how to operate the franchise and both attended regular owners' meetings. In addition, both read the manual, which contained the complete plans for the operation of the franchise, and had access to it at all times. After the termination of the franchise, they began publishing Penny Power together, although the roles were switched, with defendant now the owner of record. And, as noted, the trial court found that Gold Messenger and Penny Power were "quite similar."

Moreover, as discussed, the essential purpose of the covenant is the protection of plaintiff's trade secrets. Thus, it is particularly significant that, under the facts found by the trial court, defendant's assistance to the covenantor here would constitute a misappropriation of trade secrets, which is, in and of itself, grounds for an injunction against defendant under the Colorado Uniform Trade Secrets Act. *See* § 7–74–103, C.R.S. (1986 Repl.Vol. 3A) ("Temporary and final injunctions including affirmative acts may be granted on such equitable terms as the court deems reasonable to prevent or restrain actual or threatened misappropriation of a trade secret."); *see also Bishop & Co. v. Cuomo,* 799 P.2d 444 (Colo.App.1990) (standard for issuing preliminary injunction under Trade Secrets Act is same as that for other preliminary injunctions).

■ Accordingly, based on our resolution of these issues, we conclude that the trial

court correctly determined that there is a reasonable probability that plaintiff will succeed on the merits of his breach of covenant claim at trial and, therefore, properly granted preliminary injunctive relief.

The order is affirmed.

ROY and PIERCE *, JJ., concur.