**HARVEY BARNETT, INC., a Florida corporation, and Infant Swimming Research, Inc., a Florida corporation, Plaintiffs,**

v.

**Ann SHIDLER, individually and d/b/a Infant Aquatic Survival, and Judy Heumann, individually and d/b/a Infant Aquatic Survival, and Allison Geerdes, individually and d/b/a Infant Aquatic Survival, Defendants.**

No. CIV. A. 00–B–731.

United States District Court,
D. Colorado.

April 16, 2001.

1248

Peter A. Jaffe, Douglas Jaffe, McCoy, CO, for Plaintiffs.

Michael J. Shidler, Michael J. Shidler & Associates, Denver, CO, Franklin Christopher Chrisbens, Kristin M. Berdan, Chrisman, Bynum & Johnson, P.C., Boulder, CO, for Defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BABCOCK, Chief Judge.

Plaintiffs, Harvey Barnett, Inc. and Infant Swimming Research (collectively "ISR") bring claims for breach of contract, misappropriation of trade secrets, unjust enrichment, trademark infringement, Lanham Act violations, unfair competition and deceptive trade practices, and exemplary damages. Defendants, Ann Shidler, Judy Heumann, Allison Geerdes, and Infant Aquatic Survival (collectively "Defendants") counter-claim for breach of contract, unjust enrichment, breach of fiducia-

ry duty, tortious interference with contract and prospective economic advantage, and breach of covenant of good faith and fair dealing. ISR moves for a preliminary injunction under Rule 65. It requests that I enjoin Defendants from training other instructors in the ISR methods. The motion has been briefed and an evidentiary hearing held. Following the presentation of ISR's case-in-chief, I granted Defendants' Fed.R.Civ.P. 50 motion for judgment as a matter of law as to Allison Geerdes. For the reasons set forth below, I deny ISR's motion for a preliminary injunction as to Ann Shidler and Judy Heumann.

## I. Findings of Fact

Harvey Barnett is the founder and President of ISR. He holds a Ph.D. in psychology, and developed a program to teach infants and toddlers to survive in water. Children are taught, through a series of "Prompts and Procedures," to float on their backs to breathe, and then to flip over and swim toward a wall or other safe area. While swimming, the children are taught to intermittently flip over and float on their backs to rest and breathe. Upon reaching the wall or shore they are taught to pull themselves up out of the water or hang on to the side of the wall with their faces out of the water until help arrives. Other variations of this skill are taught by swimming schools around the world and throughout the United States. Children are essentially taught to swim, flip over and float, then flip over and swim again. Thus, the method is called "swim, float, swim."

As demand for Dr. Barnett's program grew, he trained other adults to become ISR swim instructors. Eventually some of these instructors became "master instructors," who in turn taught other instructors. In this way, ISR became a national program. Instructors across the country became independent contractors, using the Infant Swimming Research name and methods. ISR is paid a fee for each instructor trained, as well as a fee for each student taught. ISR also held annual re-certification symposiums for its instructors.

ISR provides program materials both to instructors and to parents who enroll their children in ISR. Instructors receive training, including a manual with material from other researchers and Dr. Barnett's research and methodology. Instructors also receive a videotape of "Prompts and Procedures." This tape shows instructors how to use behavioral conditioning to train children to respond in certain ways. For example, the video teaches the instructor to tap the child's fingers when he or she successfully latches onto the wall, thereby reinforcing the desired behavior. Both the manual and the video covers cues that a child might be in physical distress and appropriate responses to that distress, as well as other water safety issues. ISR eventually created the *Instructor Development Handbook* to facilitate the training of new instructors. Parents are given the *Parent Resource Manual*, which explains the methods used in the classes, recommended diet and sleep for children in the program, and the parent's role in lessons. Parents and observers are allowed to watch and videotape the lessons.

Defendants Judy Heumann and Ann Shidler trained as ISR instructors. Prior to becoming an ISR instructor, Ms. Heumann taught swimming lessons through other programs, including variations on the swim, float, swim method. Between 1972 and 1984 she developed her own methods of teaching swim, float, swim. She was trained by ISR in 1984, using commercially available texts. She was certified as a master instructor in 1987. At that time she received the 1986 version of Dr. Barnett's *The Science of Infant Swimming,* provided to her as a computer print-

out with no binding. Ms. Heumann trained four other instructors between 1987 and 1992, and each time used the 1986 *The Science of Infant Swimming.* Although a new version of *The Science of Infant Swimming* was produced in 1994, Ms. Heumann never received a copy. Since leaving ISR Ms. Heumann has continued to teach swimming to infants and young children, although her program contains significant variations from the ISR program. She has received some training from other swim schools and professional organizations which teach the swim, float, swim method. She has not, however, trained any additional instructors. Ms. Heumann never received the *Instructor Development Handbook.*

Ms. Shidler is a registered nurse, and was an R.N. prior to becoming an ISR instructor. She was trained by ISR in 1990, and received a *Parent Resource Manual* and the 1986 *The Science of Infant Swimming.* She was certified as a master instructor in 1993. Ms. Shidler taught two instructors, one in 1994 and one in 1999. By 1999 she had received the 1998 Prompts and Procedures video and the 1994 *The Science of Infant Swimming.* Ms. Shidler never received the ISR *Instructor Development Handbook.*

While affiliated with ISR, both Ms. Heumann and Ms. Shidler signed a "Non-disclosure and Confidentiality Agreement" and a "License Agreement." The Non–Disclosure Agreement states in pertinent part that the "Licensee" has received confidential information from Dr. Barnett and ISR. Dr. Barnett and ISR agree to furnish further confidential information on the condition that "Licensee agrees to hold said further confidential information in trust and confidence and agrees that it shall be used only for the contemplated purposes as set forth in said license agreement and this agreement, and shall not be used for any other purpose, or disclosed to any third party." *See, e.g.,* Exhibit 7.

The License Agreement contains two pertinent sections. The first, entitled "Confidentiality of Information," requires that the Licensee not train instructors or assistants without the permission of ISR. It provides liquidated damages of $50,000 for each breach of the agreement. *See, e.g.,* Exhibit 11. The License Agreement then sets out in a section entitled "Covenant Not to Compete" that the Licensee not teach infants or children to swim, or train others to teach infants and young children to swim, within 500 miles of the Licensee's current business address. The covenant not to compete lasts for two years from the termination of the Agreement, and applies to both self-employment and employment for other organizations. *See id.* No other provisions refer to the training of instructors.

Ms. Shidler and Ms. Heumann eventually separated from ISR. The three Defendants formed Infant Aquatic Survival, a company which teaches infant and child swimming in Colorado. They teach a swim, float, swim method, although they have significantly deviated from ISR methods.

ISR asserts that its program is a trade secret, both because of unique methods and because it teaches children survival skills in ten minutes a day for three to four weeks. ISR admits, however, that its program was not a trade secret before 1996. It argues that in 1996 the program became fully developed and acquired trade secret status. At the beginning of the evidentiary hearing, ISR stipulated that the only issue on its application for injunctive relief is whether the use of Prompts and Procedures in training instructors and the application of behavioral science to teaching instructors is subject to the Non–Disclosure and Confidentiality Agreement. Al-

though the Agreements include a Florida choice of law provision, the parties have stipulated that Colorado law is virtually identical and should apply.

## II. Motion for a Preliminary Injunction

■ The purpose of a preliminary injunction under Fed.R.Civ.P. 65 is to preserve the status quo between the parties pending a final determination on the merits. *See University of Texas v. Camenisch,* 451 U.S. 390, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981). A preliminary injunction is an equitable remedy that invokes the sound discretion of the district court. *See Lundgrin v. Claytor,* 619 F.2d 61, 63 (10th Cir.1980). The burden is on the movant to make a *prima facie* showing of a probable right to the ultimate relief and a probable danger of injury if the motion is denied. *See id.* A preliminary injunction may issue if the movant clearly shows: (1) a substantial likelihood of success on the merits; (2) irreparable injury if the injunction is not granted; (3) that injury outweighs any harm the preliminary injunction will cause the opposing party; and (4) the preliminary injunction is in the public interest. *See SCFC ILC, Inc. v. Visa USA, Inc.,* 936 F.2d 1096, 1098 (10th Cir. 1991). The nature of the injunction may further increase the movants' burden. Certain types of preliminary injunctions give rise to a heightened burden. *See id.* at 1090–99. However, none of these apply to ISR.

■ The Tenth Circuit has adopted a modified "likelihood of success" requirement. If the movant has satisfied the other preliminary injunction requirements, the movant may establish likelihood of success by showing questions "so serious, substantial, difficult and doubtful, as to make the issues ripe for litigation and deserving of more deliberate investigation." *Walmer v. United States Department of Defense,* 52 F.3d 851, 854 (10th Cir.1995); *City of*

*Chanute v. Kansas Gas and Elec. Co.,* 754 F.2d 310, 314 (10th Cir.1985).

### A. Substantial Likelihood of Success on the Merits

ISR argues that it will succeed on the merits of the case. It believes that it will show that its program consists of trade secrets, that even if the program is not a trade secret Defendants are required to treat it as such because of the Non–Disclosure Agreement. I consider each argument in turn.

### 1. Trade Secrets

ISR first argues that its program is a trade secret, and that the trade secret arose in 1996. I disagree.

■ What constitutes a trade secret is generally a question of fact. *See Gates Rubber Co. v. Bando Chem. Indus., Ltd.,* 9 F.3d 823, 848 (10th Cir.1993). Colorado has adopted the Uniform Trade Secrets Act, which defines trade secret as "any scientific or technical information, design, process, procedure, formula, [or] improvement ...." Colo.Rev.Stat. § 7–74–102. The following factors are considered in determining whether certain information is a trade secret:

(1) the extent to which the information is known outside the business;

(2) the extent to which the information is known to those inside the business;

(3) the precautions taken by the holder of the trade secret to guard the secrecy of the information;

(4) the savings effected and the value to the holder in having the information as against competitors;

(5) the amount of effort or money expended in obtaining and developing the information; and

(6) the amount of time and expense it would take for others to acquire and duplicate the information.

*See* CATHY STRICKLIN KRENDALL, COLORADO METHODS OF PRACTICE § 19.25 (4th ed.1997) (citing cases).

■ Additionally, the owner of any trade secret "must have taken measures to prevent the secret from becoming available to persons other than those selected by the owner . . . ." *Id.* § 7–74–102(4). Such precautions must be more than normal business procedures. *See Colorado Supply Co. Inc. v. Stewart,* 797 P.2d 1303, 1306 (Colo.Ct.App.1990). Such efforts may include advising employees of the existence of a trade secret, limiting access to a need-to-know basis, and controlling access to locations where the information may be learned. *See* KRENDALL, at § 19.25 (citing cases).

■ ISR argues that its program became a trade secret in 1996. However, some variation of the swim, float, swim method is known both inside and outside the children's aquatic business. Although ISR took precautions to guard the secrecy of the information, it did not do so until at least 1996, after hundreds of instructors had been trained and thousands of students taught. ISR did, eventually, advise its independent contractors and employees of the existence of a trade secret. However, ISR did not limit access to a need-to-know basis, and did not control access to locations where the information may be learned. *See Stewart,* 797 P.2d at 1306. For example, parents and bystanders were allowed to watch and videotape lessons. Although parents can not fully recreate the ISR program by watching it, Ms. Shidler testified that in 1989 her sister taught Ms. Shidler's children the ISR program for at least ten days, based solely on what she saw her own children doing in ISR lessons. These introductory sessions significantly curtailed the length of the children's later ISR-sanctioned lessons.

ISR has not addressed the value of having this information as against its competitors. It appears that some variation on ISR's methods could be created through a perusal of commercially available child psychology, child health, and swimming instruction books. *See, e.g.,* Exhibits A58, A62, A67, A69, A70, A72, A98A, A101. Although such an effort would not recreate ISR's methods identically, it would not be difficult to develop a system in which a child learned the swim, float, swim method through positive reinforcement and behavioral conditioning.

Further, ISR has not sufficiently defined the operative moment when its techniques became a trade secret, or the exact elements of its program which encompass the trade secret. Although Dr. and Mrs. Barnett both testified that in 1996 the program came together in a more complete and concise way, all other testimony was that the programs and materials which became available in 1996 were in no way different than what ISR was producing prior to 1996. Although the materials may have been more concise, the program and its materials were already in the public domain and admittedly not a trade secret at that time. Further, the Prompts and Procedures, based on principles of behavioral conditioning, was already in use to teach children swim, float, swim throughout the nation. Although other programs do not use the same labels for each action, the basic process was and is in wide use. Although ISR emphasizes that its *Instructor Development Handbook* came into existence at that time, the information contained in the *Handbook* was already in the public domain. Finally, there is no evidence that Defendants ever received the *Instructor Development Handbook* or are capable of copying it. I therefore conclude

that ISR has failed to show a substantial likelihood of proving the existence of a protectable trade secret.

### 2. Confidentiality Agreement

ISR next argues that even if its program is not a trade secret, the Defendants have a duty not to disclose any ISR information because they signed a confidentiality agreement. I disagree.

As discussed above, the Confidentiality Agreement states that, "Licensee agrees to hold said further confidential information in trust and confidence and agrees that it shall be used only for the contemplated purposes as set forth in said license agreement and this agreement, and shall not be used for any other purpose, or disclosed to any third party." *See, e.g.,* Exhibit 7. It is therefore necessary to look to the terms of the License Agreement. The License Agreement mentions the training of additional instructors in two sections. One is entitled "Covenant Not to Compete" and one is entitled "Confidentiality of Information." I consider the legal effect of each separately.

### a. Covenant Not to Compete

█ The License Agreement sets out in a section entitled "Covenant Not to Compete" that:

"Licensee shall not, during the term of this Agreement and for two (2) years immediately following the termination of this Agreement, regardless of who initiated the termination, engage directly or indirectly in the teaching of infants or young children to swim or engage in the business of training other individuals for the purpose of teaching infants or young children to swim, other than pursuant to the terms of this agreement. . . . This Covenant Not to Compete shall be effective within a five hundred (500) mile radius from the present site of the business address of Licensee. This Cove-nant applies to self-employment or employment on behalf of any other person, firm, corporation, partnership or other business organization."

*See id.*

Colorado has limited non-competition contracts to narrowly defined categories. The statute states in relevant part:

"Any covenant not to compete which restricts the right of any person to receive compensation for performance of skilled or unskilled labor for any employer shall be void, but this subsection (2) shall not apply to:

(a) Any contract for the purchase or sale of a business or the assets of a business;

(b) Any contract for the protection of trade secrets;

(c) Any contractual provision providing for recovery of the expense of educating and training an employee who has served an employer for a period of less than two years;

(d) Executive and management personnel and officers and employees who constitute professional staff to executive and management personnel."

Colo.Rev.Stat. § 8–2–113. A covenant that fails to meet one of the exceptions defined in the statute "is facially void, rather than voidable. . . ." *Management Recruiters of Boulder. Inc. v. Miller,* 762 P.2d 763, 765 (1988). Section (b) allows parties to enter into non-competition contracts to protect a trade secret. Of course, any information ISR wished to protect under this section must be a *bona fide* trade secret. *See Porter Indus. v. Higgins,* 680 P.2d 1339 (Colo.Ct.App.1984). However, I have already found that the ISR program is unlikely to constitute a protectable trade secret. No other exceptions to the Colorado statute apply. Because the Covenant not to Compete contained in the License Agreement is likely void under Colorado

law, ISR has failed to show a substantial likelihood of success on the merits.

### b. Confidentiality of Information

■ The section entitled "Confidentiality of Information" states that the "Licensee agrees not to train or not to endeavor to train instructors or assistants in the same or similar methods without SPECIFIC WRITTEN CONSENT FROM LICENSOR .... It is stipulated that if Licensee breaches the provision of this paragraph, Licensor shall be entitled to recover fifty thousand dollars ($50,000.00) as liquidated damages for such breach, without affecting Licensor's rights to injunctive relief." See, e.g., Exhibit 11.

ISR cites Kodekey Elecs., Inc. v. Mechanex Corp., 486 F.2d 449 (10th Cir.1973) for the proposition that an agreement not to disclose a trade secret is enforceable, even if no underlying trade secret exists. The Colorado courts have found that when the terms of an agreement declare that confidential information constitutes a trade secret and that the confidential nature of the information will not be subject to contest, the agreement is enforceable. See Gold Messenger, Inc. v. McGuay, 937 P.2d 907, 911–12 (Colo.Ct.App.1997); Kodekey Electronics, Inc. v. Mechanex Corp., 486 F.2d 449 (10th Cir.1973). However, I find these cases distinguishable.

The agreement in McGuay stated that "confidential information constitutes the 'trade secrets' of Gold Messenger and that the confidentiality of this information will not be subject to contest." McGuay, 937 P.2d at 911. No such non-contest clause appears here. Moreover, the court in McGuay found that a trade secret did in fact exist. Thus, the language in the contract bolstered the court's own conclusion. See id. at 911–12. In Kodekey, the court, applying Colorado law, found that an agreement by defendants not to disclose information, not to compete, and not to use information detrimentally was an acknowl-

edgment of fact that the information was a trade secret. The court, applying pre-Uniform Trade Secrets Act law, found that a trade secret existed. Therefore, the language in the Kodekey contract also served to reinforce the court's conclusion that a trade secret existed. See Kodekey, 486 F.2d at 449. Here, however, no such acknowledgment exists. Further, any such acknowledgment would be contrary to my previous finding that no trade secret exists. Finally, both McGuay and Kodekey involved information which had been kept confidential. Here, in contrast, ISR made no effort to keep its program secret until 1996.

■ Even assuming, however, that I were to find that Defendants' signature on the Non–Disclosure and Confidentiality Agreement created an enforceable duty on Defendants not to disclose information, the language used by ISR creates an unenforceable covenant not to compete.

The Non–Disclosure and Confidentiality Agreement states that the confidential information relates "to specialized methods, procedures and techniques for teaching infants and children water survival, *swimming and associated aquatic skills* ...." See, e.g., Exhibit 8 (emphasis added). The License Agreement then requires the Defendants "not to endeavor to train instructors or assistants in the same *or similar methods* without SPECIFIC WRITTEN CONSENT FROM LICENSOR .... Terms of this and all paragraphs *are permanent*." See, e.g., Exhibit 9 at 3 (italicized emphasis added).

This language is unreasonably broad. First, its duration is unreasonable, as it would prevent Defendants from teaching swimming or aquatic skills to children or other instructors in perpetuity. Second, its geographic scope is limitless. Moreover, as I determined, ISR's program consists in large part of information available

in the public domain. Therefore, the limitations in the Agreement are in conflict with Colorado's clear stance against broad non-compete agreements. *See* Colo.Rev. Stat. § 8–2–113(a) ("Any covenant not to compete which restricts the right of any person to receive compensation for performance of skilled or unskilled labor for any employer shall be void . . . ."); *Rivendell Forest Prod., Ltd. v. Georgia–Pacific Corp.,* 824 F.Supp. 961, 969 (D.Colo.1993) (non-competition agreement must be reasonable as to both duration and scope), *rev'd on other grounds,* 28 F.3d 1042 (10th Cir.1994); *Axelson v. Columbine Laundry Co.,* 81 Colo. 254, 254 P. 990 (1927) (six month provision held enforceable); *Weber v. Nonpareil Baking Co.,* 85 Colo. 232, 274 P. 932 (1929) (perpetual covenant limited to one county held enforceable). Because the broad language of the Agreement would perpetually limit Defendants' ability to train other instructors the widely-known skill of teaching swimming to infants and young children worldwide, it is unenforceable.

I therefore conclude that ISR has failed to show a substantial likelihood of proving an enforceable confidentiality agreement, and thus has failed to show a substantial likelihood of success on the merits.

### B. *Irreparable Injury*

 ISR next argues that it will suffer irreparable injury without the preliminary injunction, as it is losing its reputation as providing the only successful infant swimming program to teach infants as young as six months, in ten minutes a day for three to four weeks, how to survive in the water. I disagree. Such an argument speaks to competition for clients, not the potential harm from Defendants teaching other instructors. ISR has presented no persuasive evidence of irreparable injury should the motion be denied.

Further, "[a]lthough there is no black letter definition of what constitutes an irreparable injury, the essence of the concept requires a substantial threat of harm to the movant that cannot be compensated by money." *Mountain Med. Equip., Inc. v. Healthdyne, Inc.,* 582 F.Supp. 846, 848 (D.Colo.1984) (citations omitted). Any difficulty in calculating damages, should the Defendants train instructors, has been addressed by the Licensing Agreement. That Agreement includes a liquidated damages clause requiring Defendants to pay $50,000 for a breach of the Agreement. *See Perino v. Jarvis,* 135 Colo. 393, 312 P.2d 108 (1957) (liquidated damages clause is valid and enforceable if: (1) at the time the contract was entered into, the anticipated damages in case of breach were difficult to ascertain; (2) the parties mutually intended to liquidate them in advance; and (3) the amount of liquidated damages, when viewed as of the time the contract was made, was a reasonable estimate of the potential actual damages the breach would cause). Therefore, any loss to ISR is not "irreparable," as ISR wrote the clause and chose the amount that it felt would compensate its loss. I therefore conclude that ISR has failed to meet its burden to show irreparable loss.

### C. *Injury Outweighs Harm to the Opposing Party*

ISR argues that the potential injury to its business outweighs harm to the Defendants because Defendants' activities pander on ISR's goodwill, and may encourage others to copy ISR's program. I disagree. Again, this argument speaks to competition for clients, not the teaching of other instructors.

ISR argued at the hearing that allowing Defendants to teach other instructors would enlarge the lawsuit, adding additional defendants and further scrambling

the proverbial egg. However, Defendants have testified that they are not currently training new instructors, and have no plans to teach new instructors. Defendants also testified that they are no longer teaching the ISR program, but rather are teaching based on a conglomeration of skills they learned independently, through ISR, and through other training programs. Defendants testified that were they to teach other instructors, their curriculum would be comprised of their own methods and theories, and it would not be a regurgitation of ISR's program. In fact, Defendants have returned all ISR materials, including books and videos, making it difficult to exactly replicate the ISR program. Defendants do not have, and never received, the ISR *Instructor Development Handbook,* further hampering them should they wish to teach ISR methods. Both Ms. Heumann and Ms. Shidler testified credibly that they no longer believe in the ISR protocol, and would not teach it to another instructor. Thus, ISR has provided no evidence as to how any injury it would suffer, should Defendants train another instructor, would outweigh any harm to Defendants should an injunction enter. ISR has therefore failed to meet its burden on this point.

### D. Public Interest

ISR argues that a preliminary injunction is in the public's best interest, as children currently taking classes with Defendants are in danger of serious injury or death due to Defendants' substandard skills. ISR asserts that it monitored the Defendants' technique and abilities when Defendants were affiliated with ISR, and required Defendants to update their skills regularly. Because ISR is no longer monitoring Defendants, it believes that children's lives are in danger if taught by Defendants. Further, ISR argues that if instructors are trained improperly, children could die. I am unpersuaded.

The bulk of ISR's argument again speaks to Defendants' teaching of students, not training of instructors. Although improperly trained instructors could be detrimental to children's safety. Defendants are not currently training new instructors, have no plans to teach new instructors, and would not train another instructor in the ISR method. ISR has provided no persuasive evidence that Defendants teaching their current program pose any greater risk to students than does the average ISR instructor, or for that matter, others teaching children by similar systems. Further, ISR has provided no evidence that any instructor trained in Defendant's curriculum would pose any greater risk to children than does the average new ISR instructor. I therefore conclude that ISR has failed to meet its burden to show that a preliminary injunction is in the public's best interest.

Accordingly, IT IS ORDERED that:

1. Plaintiffs' motion for a preliminary injunction is DENIED.